RIVERSIDE COAL COMPANY, Inc., a Kentucky Corporation, Plaintiff-Appellee,

v.

UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.

No. 18293.

United States Court of Appeals Sixth Circuit.

April 4, 1969.

Willard P. Owens, Washington, D. C., for appellant, Edward L. Carey, Willard P. Owens, Washington, D. C., Albert W. Spenard, Madisonville, Ky., on brief.

Frank C. Ingraham, Nashville, Tenn., for appellee.

Before WEICK, Chief Judge, O'SULLIVAN and EDWARDS, Circuit Judges.

WEICK, Chief Judge.

In the District Court the plaintiffs, James Jessup, an individual doing business as Jessup Coal Company (Jessup), and Riverside Coal Company, Inc. (Riverside), sued United Mine Workers of America (UMW) for damages to their respective businesses resulting from the alleged violation by UMW of § 303 of the Labor Management Relations Act of 1947 [1], and the common law of Kentucky.

---

1. Section 303 of the Labor Management Relations Act, 1947, 29 U.S.C. § 187, which was in effect at the time, provides:
 "SEC. 303. (a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—

 (1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;
 (2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the

The case was tried to the court without a jury. The District Judge, in an opinion appearing on eighteen pages of the printed record, found violations by UMW of both § 303 and the common law of Kentucky, and that Riverside was damaged as a proximate result thereof in the amount of $20,000, for which amount he entered judgment against UMW. He found no damage for which Jessup was entitled to recover and dismissed the complaint as to him. Only UMW has appealed. We affirm.

The first question presented by UMW is whether the action was barred by the Kentucky statute of limitations, K.R.S. 413.140, which provided that an action for conspiracy shall be commenced within one year after the cause of action accrued.

■■ Conspiracy is not an element of the claim for violation of § 303 which involved a secondary boycott, the purpose of which was to force Riverside to recognize or bargain with UMW. K.R.S. 413.140 would therefore not apply to an action brought under § 303.

While the complaint by an amendment alleged that the acts of UMW also constituted an unlawful conspiracy, it is clear that plaintiffs' cause of action under the common law of Kentucky was for wrongful interference with plaintiffs' business. This is a tort which has long been recognized by the courts of Kentucky. United Construction Workers v. New Burnside Veneer Co., 274 S.W. 2d 787 (Ky.1955).

Although violations of both § 303 and the common law of Kentucky are alleged, these were not separate causes of action but were merely different grounds to support plaintiffs' single cause of action for wrongful interference with its business. United Mine Workers v. Meadow Creek Coal Co., 263 F.2d 52 (6th Cir. 1959).

■ The District Judge was correct in applying Kentucky law and in holding that the one-year conspiracy statute of limitations was inapplicable.

UMW next contends that § 6 of the Norris-LaGuardia Act [2] applies in determining its responsibility for the acts of its agents and members. It argues that plaintiff did not establish by clear proof that UMW or the officers and field representatives of District 23 of UMW

---

provisions of section 9 of the National Labor Relations Act;

(3) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if other labor organization has been certified as the representative of such employees under the provisions of section 9 of the National Labor Relations Act;

(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class unless such employer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing such work. Nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under the National Labor Relations Act.

(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of Section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

2. Section 6 reads:

"No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

actually participated in or authorized or ratified the unlawful acts of individual officers, members or agents, and that UMW had no knowledge thereof.

Section 6 was repealed in part by the Labor Management Relations Act—

"* * * which expressly provides that for the purposes of that statute, including § 303, the responsibility of a union for the acts of its members and officers is to be measured by reference to the ordinary doctrines of agency, rather than the more stringent standards of § 6." United Mine Workers v. Gibbs, 383 U.S. 715, 736, 86 S.Ct. 1130, 1144, 16 L.Ed.2d 218 (1966).

Section 6 therefore applies only to the claim for violation of the common law of Kentucky and not to the § 303 violation where the ordinary doctrines of agency control. In *Gibbs*, the District Court had found no violation of § 303, but retained pendent jurisdiction and tried the case under the common law of Tennessee. It was therefore necessary in *Gibbs* to determine the liability of UMW under the strict provisions of § 6.

██ In the present case, however, the District Court found that "there is clear and substantial proof to establish agency so as to hold the union responsible for the wrongful acts of these officers, both on the claim asserted under Section 303 and the state claim" based on the common law of Kentucky. In our opinion, these findings were supported by substantial evidence and are not clearly erroneous.

The Supreme Court has interpreted the standards set forth in § 6 and has stated:

"We are of the opinion that the requirement of 'authorization' restricts the responsibility or liability in labor disputes of employer or employee associations, organizations or their members for unlawful acts of the officers or members of those associations or organizations, although such officers or members are acting within the scope of their general authority as such officers or members, to those associations, organizations or their officers or members who actually participate in the unlawful acts, except upon clear proof that the particular act charged, or acts generally of that type and quality, had been expressly authorized, or necessarily followed from a granted authority, by the association or non-participating member sought to be charged or was subsequently ratified by such association, organization or member after actual knowledge of its occurrence." United Brotherhood of Carpenters v. United States, 330 U.S. 395, 406–407, 67 S.Ct. 775, 781, 91 L.Ed. 973 (1947).

The Court continued by way of amplification:

"There is no implication in what we have said that an association or organization in circumstances covered by § 6 must give explicit authority to its officers or agents to violate in a labor controversy the Sherman Act or any other law or to give antecedent approval to any act that its officers may do. Certainly an association or organization cannot escape responsibility by standing orders disavowing authority on the part of its officers to make any agreements in violation of the Sherman Act and disclaiming union responsibility for such agreements. * * * The grant of authority to an officer of a union to negotiate agreements with employers regarding hours, wages, and working conditions may well be sufficient to make the union liable. An illustrative but nonrestrictive example might be where there was knowing participation by the union in the operation of an illegal agreement after its execution. And the custom or traditional practice of a particular union can also be a source of actual authorization of an officer to act for and bind the union." *Id.* at 409–410, 67 S.Ct. at 783.

The District Court found that the issues of the case arose out of three labor disputes between Jessup, Riverside and

UMW. The first two disputes involved Jessup and UMW. The third dispute involved Riverside and UMW. Jessup was the principal shareholder of Riverside and his family owned the residue of its issued shares. The primary cause of the labor disputes, as found by the Court, did not arise out of the traditional struggle between a union and a non-union mine operation.

Jessup was a small mine operator. He had signed a contract with UMW when he was engaged in business as an individual, even though he stated that he could not afford to make the Welfare and Retirement Fund payments of forty cents per ton. He paid only about twenty-five per cent of the payments due and misrepresented the tonnage produced. After incorporation of Riverside, Jessup refused to sign the National Bituminous Coal Wage Agreement of 1950 as amended, not because he was opposed to having a union shop, but because of the economic fact that he could not operate at a profit under the agreement. He did, however, check off the union dues of his employees who belonged to the union.

The District Court found that during the time material to this action, Arthur Chaney, a district representative of District 23 of UMW, was charged, together with other representatives of UMW, with the duty of persuading coal operators to sign the National Bituminous Coal Wage Agreement of 1950 as amended. UMW concedes that these men were its agents. It questions only their authority to commit the unlawful acts shown.

The District Court also found that on October 7, 1957, Chaney was going to help Jessup's truck drivers to "* * * fight it out * * *. We make our own rules and go by them."

The District Court continued:

"On October 8, 1957, he threatened '* * * if the men didn't come out of the pit, they was going up there and beat them up and throw them out.' Then on October 16, 1957, he threatened the truck drivers that if they did not cease hauling coal their trucks would be overturned. On the same date he went to the mine and threatened the plaintiff's employees. On June 13, 1958, he and some pickets went to the pit and threatened the employees 'If they didn't get out, he was going to throw every damn one of them out. * * *' On the same date, he told plaintiff that he was going to put him out of business saying 'We are going to do away with every damn one of you little dog holes. * * * They ain't [sic] nothing but a headache. We want you out of business and get out of our way.' * * On the occasion that Jessup appeared to run him down, Chaney and another representative of the Union angrily told the officer in charge of the state troopers that if he didn't do something about it ' * * * they would take the law into their own hands.' On May 16, 1959, he threatened the pit employees, saying 'we'll get you * * * if we don't get you down here, we'll get you on the way home. You'll never eat supper at home tonight.' "

This recounting of the evidence clearly indicates that UMW's agents were actually involved in the threats of violence which took place. The issue, therefore, joined is whether UMW can be held responsible for the acts of its agents charged generally with extending the "National Agreement."

In *Gibbs*, the Supreme Court was faced with a similar question of whether an international union was liable for the acts of its agents within § 6. United Mine Workers v. Gibbs, *supra* 383 U.S. at 735, 86 S.Ct. 1130. It seems implicit in the Court's discussion that the actions of the international's field representative, George Gilbert, could have been sufficient to hold the union liable. In footnote 28 on page 737, at page 1144 of 86 S.Ct., the Court stated:

"Liability of the international union is premised on the acts of Gilbert and the UMW's other agents, or not at all."

In narrowing the issue therein involved, the Court stated:

"The relevant question, however, is whether Gilbert or other UMW representatives were clearly shown to have endorsed violence or threats of violence as a means of settling the dispute." *Id.* at 741, at 1147 of 86 S.Ct.

■ Although the Supreme Court in *Gibbs* did not find the evidence sufficient to warrant finding the international union liable, here it is clear that UMW's agents actually participated in the threats of violence. In view of the authorities and the evidence, UMW must be said to have "participated in" or "actually authorized" the acts of its appointed agents charged with the extension of the 1958 Amendment. Thus, the requirements of § 6 have been met as to the common law claim.

UMW further contends that the evidence does not support a finding of a violation of § 303. Essentially, it argues that there was no secondary boycott within the meaning of the statute; rather, it contends that the activity of its members constituted lawful picketing.

■ The policy objective embodied in § 8(b) (4) [3] is an attempt to balance the right of labor organizations to bring pressure to bear upon offending employers in primary labor disputes and at the same time shield unoffending employers and others from pressures in controversies which are not their own. NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951) and United Steelworkers of America v. NLRB, 289 F.2d 591, 594 (2d Cir. 1961).

■ It is clear that the activity of the members of the union picketing the entrance to the mine is not secondary activity prohibited by § 8(b) (4), even though this entrance was used by independent truckers as well as regular employees of the mine. United Steelworkers of America v. NLRB, 376 U.S. 492, 498–499, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964); Local 761 International Union of Elec. Radio & Machine Workers v. NLRB, 366 U.S. 667, 680–682, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

The Supreme Court said in Local 761, Elec. Workers v. NLRB, *supra* at 681, 81 S.Ct. at 1293:

"[I]f a separate gate were devised for regular plant deliveries, the barring of picketing at that location would make a clear invasion on traditional primary activity of appealing to neutral employees whose tasks aid the employer's everyday operations."

Surely in the case before us, the barring of picketing at an entrance used by both the regular primary employees and neutral truckers would constitute a "clear invasion on traditional primary activity" of appealing to the primary employees.

■ Nor does primary picketing accompanied by threats and violence constitute a violation of § 8(b) (4). United Steelworkers v. NLRB, *supra* 376 U.S. at 501–502, 84 S.Ct. 899, 11 L.Ed.2d 863.

The issue, therefore, is whether there is substantial evidence of proscribed activity which supports the finding of the District Court of violations of § 303.

A review of the record indicates a clear pattern of threatening and violent conduct, not only at the site of the picketing but also at various locations away from the primary site. Raymond Bethel, a self-employed truck driver engaged by D. V. Goodnight, testified that during the labor dispute herein involved he crossed the picket line and was often

---

3. 29 U.S.C. § 158(b) (4). It has long been recognized that § 8(b) (4) is the counterpart of § 303(a) and therefore the same tests and rationale apply to both in regard to the facts necessary to give rise to the relief specified in each. Only the relief specified differs. International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237, 243–244, 72 S.Ct. 235, 96 L.Ed. 275 (1952); United Brick & Clay Workers v. Deena Artware Inc., 198 F.2d 637, 639 (6th Cir. 1952), cert. denied, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694; Haughton v. International Woodworkers, 168 F. Supp. 273, 278 (D.C.Or.1958), aff'd 294 F.2d 766 (9th Cir. 1961).

subjected to the cursing and rock-throwing of the pickets. On two occasions Bethel was awakened at night by loud noises which sounded like large firecrackers going off very close to his house. He also testified that carloads of men passed his house, yelling, and that this frightened both his family and his neighbors. He stated that on one occasion the automobile carrying the men was that of Arthur Chaney. These events occurred only during the time of the labor dispute.

Robert Sutton, a truck driver, who owned the truck he used while hauling during this labor dispute, was shot from ambush on May 16, 1959, just a short distance from his home. Two shots were also fired at his brother's truck which was following close behind him. This incident took place while both men were returning to Robert Sutton's home after a day's hauling through the picket line at the site of the dispute.

■ Appellant does not dispute the finding of the District Court as to the independence of these truckers; rather, it urges that these truckers were not neutral to this dispute. This same question was presented before this Court in United Mine Workers v. Osborne Mining Co., 279 F.2d 716 (6th Cir. 1960) cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L. Ed.2d 103, where we held that truckers for a strip mining operation, who were as independent as those here involved, were "neutral." *Id.* at 724. Thus, the

above threats and violence were directed at neutral secondary parties away from the primary site, and therefore were clearly violative of § 303.

These are not, however, the only coercive and threatening acts which occurred away from the primary site. Pat Martin, who was Assistant General Manager of Norton Coal Company, testified that he received an anonymous telephone call threatening bodily harm if his company continued affiliation with the Riverside Coal Company. This call was received in Nortonville, Kentucky.

Willie Gary, a dragline operator for appellees, testified that organizers came to his home in Hartman, Kentucky, which was about twenty-five miles from the mine site. These men advised him not to return to work because they were trying to get Jessup to sign a contract. This incident frightened Gary and his family.

Although Pat Martin was not an "employee" within § 2(3) of the Act, and Willie Gary was an employee of the primary employer, so that the above-mentioned activities involving these two men were not violations of § 303, these incidents do illustrate the nature of the nonprimary situs activity involved in this case.[4]

■ It is clear that there is substantial evidence to support the findings of the District Court and they are not clearly erroneous.

---

4. Section 2(3) of the Act provides:
 "*Sec. 2.* When used in this Act—
 \* \* \* \* \*
 (3) The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or

person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined."
See NLRB v. Servette, Inc., 377 U.S. 46, 51, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964) where the Court notes the limitations placed on the pre-1959 Act by virtue of the above definition and the language of § 8(b) (4).

Finally, UMW contends that the finding of the District Court that "the evidence presented in connection with lost profits and the value of the Mercer-Moore lease establishes that Riverside did sustain damages by reason of the defendant's wrongful conduct in the sum of $20,000" is clearly erroneous. UMW asserts that the evidence is insufficient to support the finding of damages in the amount of $20,000, and that the award is not limited to the consequences of "violent" conduct. Thus it is claimed that the award of damages was "based on total strike activity and not confined to the direct consequences of violent conduct."

 The questions raised concerning damages are essentially questions of fact, and at least with regard to the alleged damages resulting from lost profits, the law is clear and not disputed. As stated in United Mine Workers v. Osborne Mining Co., *supra* 279 F.2d at 727:

"Profits are recoverable where there is an established business and they can be proven with reasonable certainty." Lost profits are not recoverable when based upon "sheer speculation and guesswork" Mitchell Coal Co. v. UMW, 313 F.2d 78, 79 (6th Cir. 1963).

 It has long been recognized that once the fact of damage has been properly shown, "uncertainty as to their amount will not foreclose recovery." Flame Coal Co. v. UMW, 303 F.2d 39, 44 (6th Cir. 1962) cert. denied, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562–563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Hi Hat Elkhorn Coal Co. v. Inland Steel Co., 370 F.2d 117, 118 (6th Cir. 1966).

These principles were recognized and applied by the District Court. In the first two of the three disputes before the trial court damages were not allowed because they were "too uncertain and speculative." Jessup's records were incomplete and "the only basis for his claim that he was making a twenty-five per cent profit was his unsupported statement."

As to the third dispute, however, the District Court found that the records of the Riverside Coal Company for the fiscal year 1959 were "sufficiently complete to reflect the total income and expenses attributable to its coal mining operations during that year." The problem with these records is that Riverside's figures show a profit of $36,860 (rounded figures are used) on production pursuant to its two TVA contracts during the period from November 1, 1958 to April 30, 1959, while UMW's figures indicate a loss of $26,640 for the same period.

The first major item contributing to the large difference between the above figures, is that UMW added $21,700 to Riverside's expenses claiming that this amount was owed but unpaid by Riverside to its Welfare Fund. The District Court found that the incorporation of Jessup's proprietorship did not defeat the employees' rights under the existing collective bargaining agreement. See John Wiley & Sons v. Livingston, 376 U.S. 543, 548–551, 84 S.Ct. 909, 11 L.Ed. 2d 898 (1964); Southport Petroleum Co. v. NLRB, 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718 (1942). The District Court disregarded this alleged expense on the ground that it was a disputed, unliquidated debt.

The next item which the appellant claims should have been included as an expense is $13,708, sales commissions paid to the Norton Coal Company. This assertion was rebutted by Riverside's showing that this amount was deducted by Norton Coal Company before payment for the coal was forwarded to Riverside.

The remainder of the discrepancy is due primarily to "the difficulty of allocating the year's total expenses between the periods before and after the strike."

The only other claim of damage in connection with this dispute which the District Court found to be valid was

related to the loss of the Mercer-Moore lease. This was a twenty-five year lease covering about 1,900 acres of coal property. Riverside claimed that the lease was worth $7,000,000. This lease had been assigned by Jessup to Riverside. It is clear that the loss of this lease was a source of damage to Riverside. The real question here is the amount of that loss. The District Court properly depreciated many of Riverside's wild and inflated assertions as to the value of the lease.

The Court found:

"A much more relevant indication of the value of the lease at the time of the tort is found in the assignment to Herman Genet, Inc. only a few months after Riverside surrendered it. That assignment was made on substantially the same terms as the assignment to Riverside."

Genet paid four thousand dollars for the lease. The price also included payment of three hundred dollars per month advance royalties, and after going into production fifteen cents per ton for strip coal and ten cents per ton for underground coal.

▉ Considering all of the evidence on damage, we think it was sufficient to support an award in excess of that allowed by the District Court.

▉ Appellant's second assertion with regard to damages is, in effect, that the District Court allowed damages resulting from legal as well as illegal conduct. It is clear that in actions seeking damages for alleged illegal conduct by labor unions, the award of damages must be based upon that element of the activity which is in fact violative of state or federal law. But damages may not be awarded where they are the result of lawful activity on the part of a union.

United Mine Workers v. Gibbs, *supra,* 383 U.S. at 729–732, 86 S.Ct. 1130, 16 L.Ed. 2d 218; Local 20, Teamsters, etc. v. Morton, 377 U.S. 252, 259–261, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). Thus, federal labor policy must prevail in this area so that unions are not made to account for damages resulting from conduct which is legal under federal labor law. United Mine Workers v. Gibbs, *supra,* 383 U.S. at 729, 86 S.Ct. at 1130.

The Supreme Court, however, has also recognized that—

" * * * [S]pecial facts, if they appeared in an action for damages after picketing marred by violence had occurred, might support the conclusion that all damages resulting from the picketing were proximately caused by its violent component or by the fear which that violence engendered." Id. at 731–732,[5] 86 S.Ct. at 1142.

See also United Mine Workers v. Osborne Mining Co., *supra,* 297 F.2d at 726–727.

In the case before us, the trial court found that the damages were sustained by reason of UMW's "wrongful conduct." The record is replete with incidents of violence and threats of violence on the picket line and elsewhere. In addition, there was illegal secondary activity. As we noted in the *Osborne* case, *supra:*

"The findings of the trial judge indicate the factors he took into account in allowing compensatory damages. He resolved many disputed issues of fact. It has not been demonstrated to us that the Court made any mistake in his findings of fact relating to damages or that he applied the wrong rule of law. We think that under all the facts and circumstances of the case the Court was justified in

---

5. Our colleague, in his dissenting opinion, would remand for computation of damages resulting only from violation of the common law of Kentucky. In our judgment, remand is wholly unnecessary for here as in *Gibbs* there was only one cause of action although based on two different grounds. Furthermore, violence was involved in both primary and secondary activities and the consequences were inseparable. The evidence supports the conclusion that *all* damages were proximately caused by the violent component.

making the award which he did and we are not disposed to disturb it." *Id.* at 727.

Affirmed.

EDWARDS, Circuit Judge (dissenting).

The District Judge found a secondary boycott in violation of § 303 of the LMRA. His general assessment of damages included damages for the secondary boycott. This court's opinion affirms both the secondary boycott finding and the damage award partially based thereon.

The facts primarily relied upon to justify the secondary boycott finding relate to UMW activities (or activities attributed to the UMW) directed toward keeping truck drivers from loading coal at the struck mine site. Clearly, some of these activities were illegal under the laws of Kentucky, and where clear proof is available as to appellant UMW's responsibility therefor, an award of damages is justified.

But the truck drivers were directly engaged in the primary activity against which the strike was called. This work could not be called "unrelated to the normal operations of the employer." Local 761, International Union of Electrical Workers v. NLRB, 366 U.S. 667, 681, 81 S.Ct. 1285, 1294, 6 L.Ed.2d 592 (1961); see NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 686–687, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). The truck drivers were within the jurisdiction of the union which called the strike. Many of them were members of the UMW. Absent acts of violence the strike was a lawful labor dispute.

The Supreme Court has squarely held that acts of violence (rendered both unlawful and remediable under state law) do not serve to change primary labor activity into illegal secondary activity:

"[W]e reject Carrier's argument that whatever the rule may be in the ordinary case of separate gate picketing, the picketing of the railroad gate in this case was violative of § 8(b) (4) because it was accompanied by threats and violence. Under § 8(b) (4) the distinction between primary and secondary picketing carried on at a separate gate maintained on the premises of the primary employer, does not rest upon the peaceful or violent nature of the conduct, but upon the type of work being done by the picketed secondary employees. Such picketing does not become illegal secondary activity when violence is involved but only when it interferes with business intercourse not connected with the ordinary operations of the employer.[8]

8. Compare National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 672, 71 S.Ct. 961, 95 L.Ed. 1284, in which the Court said: 'In the instant case the violence on the picket line is not material. The complaint was not based upon that violence, as such. To reach it, the complaint more properly would have relied upon § 8(b) (1) (A) or would have addressed itself to local authorities. The substitution of violent coercion in place of peaceful persuasion would not in itself bring the complained-of conduct into conflict with § 8(b) (4). It is the object of union encouragement that is proscribed by that section, rather than the means adopted to make it felt.
\* \* \* "

United Steelworkers of America v. NLRB, 376 U.S. 492, 501–502, 84 S.Ct. 899, 905, 11 L.Ed.2d 863 (1964).

I believe the District Judge's holding as to secondary boycott activities is erroneous as a matter of law. I would reverse and remand for computation of damages resulting only from violations of the common law of Kentucky.