M. W. RITCHIE, Sr., Mark Cann, B. C. McClanahan and Henry C. Kelly, d/b/a Ritchie Coal Co., Plaintiffs-Appellees,

v.

UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.

No. 18456.

United States Court of Appeals Sixth Circuit.

May 13, 1969.

Harrison Combs, Washington, D. C., for appellant; Edward L. Carey, Willard P. Owens, Washington, D. C., E. H. Rayson, Knoxville, Tenn., on brief.

J. E. Johnson, III, N. Mitchell Meade, and Arthur L. Brooks, Jr., Lexington, Ky., for appellees.

Before PHILLIPS and EDWARDS, Circuit Judges, and KENT, District Judge.*

PHILLIPS, Circuit Judge.

This is an appeal from a judgment for damages entered in favor of appellees (Ritchie) against the United Mine Workers of America (UMW).

The action was filed under both federal law and the common law of Kentucky. Federal jurisdiction is based upon § 303 of the Labor Management Relations Act of 1947 (LMRA).¹ This action also is

---

* Honorable W. Wallace Kent, Chief Judge of the United States District Court for the Western District of Michigan, sitting by designation.

1. Section 303 of the Labor Management Relations Act, 1947, 29 U.S.C. § 187, which was in effect at the time provides:

SEC. 303 "(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—

(1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease us-

based upon a tort claim under the common law of Kentucky for wrongful interference with Ritchie's business.

The jury returned a verdict against UMW for $14,000 for the destruction of Ritchie's coal tipple, $150,000 for loss of profits, and $250,000 as punitive damages. A judgment was rendered against UMW for $414,000. For reasons set out below we reverse the judgment of the District Court.

Ritchie, a partnership, operated a coal tippling business at Sassafras, Perry County, Kentucky. It purchased coal from various independent mines. The coal was transported to Ritchie's tipple by mine owners or independent truckers. There it was processed through the tipple and loaded into railroad cars for shipment to points in Kentucky and other States.

In 1959 Ritchie was not under contract with any union. It had only three employees, none of whom was a member of UMW or any other union. During this time UMW was negotiating with the coal operators of the coal fields of Eastern Kentucky in an attempt to get the operators to sign a bargaining contract known as the National Bituminous Coal Wage Agreement of 1950, as amended in 1958. In the spring, summer and fall of 1959 there were approximately 176 small coal operators who had refused to sign the contract.

On March 16, 1959, the previous UMW contract with some of the operators expired and a strike was called. Members of the UMW Local District 30 began intense picketing of all the operators. On the opening day of the strike a large group of UMW pickets, numbering between 500 and 1,000, came to the Ritchie tipple and demanded that the contract be signed or else that the operation of the tipple be closed down. Throughout a three county area members of UMW conducted a vigorous program of mass picketing interspersed with violence. Approximately one-half of the entire Kentucky State police force was assigned to this area to keep the highways open and curtail violence. Only with the aid of State police and an injunction issued by the United States District Court was the Louisville & Nashville Railroad, with trains operated by management personnel,[2] able to serve

ing, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 of the National Labor Relations Act;

(3) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 9 of the National Labor Relations Act;

(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class unless such em-

ployer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing such work. Nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under the National Labor Relations Act.

(b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

2. Members of the railroad brotherhoods refused to cross UMW picket lines.

Ritchie and operators of other tipples and mines on a curtailed schedule. When State police found themselves unable to maintain order, the Governor of Kentucky called out the National Guard.

In the three county area State police documented a record of six cases of dynamiting public utilities; twenty cases of shooting into tipples, trucks or railroad facilities; sixteen cases of dynamiting coal tipples, augers or mine property and fifteen cases of dynamiting private property, houses, trucks or places of business; six cases of burning of coal tipples or fires at tipples; and ten cases of breach of the peace, including the flourishing of deadly weapons. The record discloses repeated instances of threats, profane name-calling, beatings and shootings at tipple operators, truck drivers and mines. One truck driver was shot through the hand while en route to the Ritchie tipple. Another truck driver was killed at the Little Shepherd tipple. A man was killed by a State policeman.

A further description of the mass picketing and violence which occurred in this three county area of Eastern Kentucky in 1959 is set forth in the opinions of this Court in Sunfire Coal Co. v. UMW, 313 F.2d 108 (6th Cir.), cert. denied, 375 U.S. 924, 84 S.Ct. 268, 11 L. Ed.2d 166, denial of new trial aff'd, 335 F.2d 958, cert. denied, 379 U.S. 990, 85 S.Ct. 701, 13 L.Ed.2d 610; and Flame Coal Co. v. UMW, 303 F.2d 39, 97 A.L. R.2d 1136 (6th Cir.), cert. denied, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125.

In the proceeding styled National Labor Relations Board v. UMW, the Board entered an order directing that UMW, District 30 and their officers and agents not exert force or commit acts of violence in various specified particulars. The order of the Board was enforced by this Court in an unpublished consent decree dated May 20, 1960. Thereafter this Court adjudged the UMW, District 30 and certain individuals to be in civil contempt for violation of the decree. N.L.R.B. v. UMW, 393 F.2d 265 (6th Cir.), cert. denied, 393 U.S. 841, 89 S.Ct. 123, 21 L.Ed.2d 113.

After the issuance of injunctions upon applications of the National Labor Relations Board and the Louisville & Nashville Railroad, mass picketing ceased but numerous incidents of violence continued in the area throughout the summer and fall of 1959.

On October 5, 1959, shortly after midnight, the Ritchie tipple was destroyed completely by fire set by unknown persons.

Ritchie filed this suit against the UMW on February 27, 1963. The jury returned its verdict against the UMW on November 7, 1966. UMW has made 17 assignments of error. We shall discuss only those issues necessary, for the proper disposition of this appeal.

### 1) Pendent Jurisdiction

Ritchie instituted this action alleging both a violation of § 303 of the LMRA and of the State common law. UMW contends that the District Court was in error in exercising its jurisdiction over the State common law claim along with the federal claim and should have dismissed that part of the action arising under State common law.

Before a federal court can properly exercise pendent jurisdiction, "the state and federal claims must derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218. The "common nucleus of fact" in the case before us was the labor dispute and the related incidents of violence which took place in the vicinity of the Ritchie tipple. If the federal and state character of the claims be disregarded and still the "plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole." *Id.* at 725, 86 S.Ct. at 1138. Based upon the allegations in the complaint and the

proof presented at the trial, we hold that the federal issue of secondary boycott had sufficient substance to warrant the exercise of the District Court's jurisdiction over both claims. "Its [pendent jurisdiction] justification lies in considerations of judicial economy, convenience and fairness to litigants * * *." *Id.* at 726, 86 S.Ct. at 1139. The application of this doctrine is within the sound discretion of the Court and we are of the opinion that the District Court did not abuse its discretion in submitting to the jury the issues related to the common law of Kentucky, applying the doctrine of pendent jurisdiction. United Mine Workers v. Gibbs, *supra.*

### 2) Statute of Limitations

 UMW contends that count two of Ritchie's complaint, which alleged an "unlawful conspiracy" to destroy its business, was barred by the Kentucky one year statute of limitations for conspiracy. K.R.S. § 413.140.[3] Ritchie argues that although the words "unlawful conspiracy" were used in the complaint, the basis of the State law claim was the common law tort of wrongful interference with business. Thus, contends Ritchie, the destruction of the tipple and the resulting damage to its business are governed by K.R.S. § 413.120.[4]

Count one of the amended complaint alleges in part that:

"[T]he defendant, through its duly authorized agents and representatives, acting within the scope and course of their authority as such agents and representatives, did destroy by dynamite and/or fire the tipple of the said Ritchie Coal Company. * * *"

Ritchie also alleged loss of profits as a direct and proximate result of the acts of UMW. Rule 8(a) (2), Fed.R.Civ.P., requires only that the plaintiff set forth a short and plain statement of the claims showing that he is entitled to relief. The designation of counts is not controlling of the interpretations to be placed on these claims. Federal pleadings are construed liberally in order to prevent errors in draftsmanship from barring justice to litigants. Rule 8(f), Fed.R.Civ.P. In so construing the complaint in the case before us, we reject the UMW's argument that the State law claim was founded in conspiracy and therefore controlled by the one year limitation period. All the necessary averments were present in the complaint to bring the State claim within the five year limitation period.

 Chief Judge Weick in the majority opinion in Riverside Coal Co., Inc. v. UMW, 410 F.2d 267, (6th Cir.) said:

"While the complaint by an amendment alleged that the acts of UMW also constituted an unlawful conspiracy, it is clear that plaintiffs' cause of action under the common law of Kentucky was for wrongful interference with plaintiffs' business. This is a tort which has long been recognized by the courts of Kentucky. United Construction Workers v. New Burnside Veneer, 274 S.W.2d 787 (Ky. 1955)."

### 3) The Clear Proof Standard

UMW contends that Ritchie did not establish by clear proof, as required by

3. "413.140 [* * *] Actions to be brought within one year.
 "(1) The following actions shall be commenced within one year after the cause of action accrued:
 * * * * *
 "(c) An action for malicious prosecution, conspiracy, arrest, seduction, criminal conversation or breach of promise of marriage."

4. "413.120 Actions to be brought within five years.

"The following actions shall be commenced within five years after the cause of action accrued:
 * * * * *
 "(4) An action for trespass on real or personal property.
 "(5) An action for the profits of or damages for withholding real or personal property.
 "(6) An action for the taking, detaining or injuring personal property, including an action for specific recovery."

§ 6 of the Norris-La Guardia Act,[5] that UMW through its field representatives or the officers of Local 30 participated in, authorized or ratified the burning of the tipple.

In United Mine Workers v. Gibbs, *supra*, the Supreme Court said:

"Plainly, § 6 applies to federal court adjudications of state tort claims arising out of labor disputes, whether or not they are associated with claims under § 303 to which the section does not apply." 383 U.S. at 737, 86 S.Ct. at 1144.

*Gibbs* leaves no doubt that the clear proof standard of § 6 applies to the claim under the common law of Kentucky but does not apply to the claim arising under § 303 of LMRA.

As to the meaning of the term "clear proof" in § 6, the Supreme Court said in *Gibbs*:

"Although the statute does not define 'clear proof,' its history and rationale suggest that Congress meant at least to signify a meaning like that commonly accorded such similar phrases as 'clear, unequivocal, and convincing proof.' Under this standard, the plaintiff in a civil case is not required to satisfy the criminal standard of reasonable doubt on the issue of participation, authorization or ratification; neither may he prevail by meeting the ordinary civil burden of persuasion. He is required to persuade by a substantial margin, to come forward with 'more than a bare preponderance of the evidence to prevail.' Schneiderman v. United States, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796." 383 U.S. at 737, 86 S.Ct. at 1145.

We have reviewed carefully the entire transcript of evidence presented in this case. While recognizing that this difficult standard of proof can be met by circumstantial evidence, we conclude that there is not "clear, unequivocal, and convincing proof" in the record to sustain the jury's findings that the UMW was responsible for the destruction of Ritchie's tipple and the resulting loss of business due to the absence of the tipple.

The burning of the tipple was described by Ritchie's night watchman as follows:

"Q. 5. Were you employed by the Ritchie Coal Company at any time during 1959? A. Yeah, when the strike come on; I worked for them about four or five months there.

"Q. 6. What did you work at? A. Night watchman.

"Q. 7. Tell the Jury what your duties consisted of. A. Well, I was to stay there and keep anybody from coming in there and destroying that coal tipple.

"Q. 8. Did you have any troubles there? A. Yes, they was fellows pass by and throw slander at you. Finally about the 5th day of October they come in there and held me up at gun point and burned it.

"Q. 9. Where were you that night? A. I was there on the job as Sassafras, Kentucky.

"Q. 10. Who was with you? A. They was a crippled boy there with me. Epperson boy.

"Q. 11. Tell the Jury exactly what happened on that night and what time it was approximately. A. Well, it was between 12:00 and 1:00

5. 29 U.S.C. § 106:
 Responsibility of officers and members of associations or thier organizations for unlawful acts of individual officers, members, and agents
 "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

o'clock. I walked down to the lower edge of the tipple, down the railroad track and turned around and come back. They was some fellows walking down the track and I turned around and then they was some coming up the track and had me between them. They got me at gun point and made me lay down and they carried gas and poured on the tipple and throwed a torch into it, and then made me run up the railroad track, up Yellow Creek.

"Q. 12. Did you have a pistol with you at that time? A. I had a .45 automatic and they took it.

"Q. 13. Did you ever get it back? A. No, sir.

"Q. 14. Did you recognize any of these men? A. No, you couldn't recognize them. They had hoods or something down over their face.

"Q. 15. Where did you go from there? A. I left there and went home after the tipple burned. The State Police come over there the next morning and I went to the State Police headquarters in Hazard.

"Q. 16. What happened to the Epperson boy? A. Why, he went home. I don't know where he is at now."

Kentucky state policemen who investigated the destruction of the Ritchie tipple testified that they never learned the identity of the person or persons who did the burning. Marion W. Ritchie, Sr. testified that he did not know who burned the tipple and that he "didn't have any leads."

The complaint charges that the UMW through its authorized agents and representatives, acting within the scope and course of their authority, destroyed the tipple. Various interrogatories were submitted by the UMW to Ritchie, one of which is set out below with its answer:

"*Interrogatory No. 6*—Give the names of persons who have knowledge of the destruction of the tipple by agents or representatives of defend-ant, as alleged by plaintiffs in Count I, paragraph 8 of the complaint.

"*Answer*—Plaintiffs have no knowledge of persons who might have knowledge of which agents or representatives of the defendant destroying plaintiffs' tipple."

It is to be emphasized that the burning of the tipple did not take place until October 5, 1959, almost seven months after the UMW mass picketing on Ritchie's property the previous March 16. The record discloses no picketing at the Ritchie tipple after April 30, 1959, when an injunction was obtained by the N.L.R.B.

In support of the judgment of the District Court Ritchie relies upon statements of UMW officials at meetings in Frankfort, Kentucky, and Washington, D. C., that if the tipple operators and owners of coal mines would sign the UMW contract, violence in Eastern Kentucky would cease. Ritchie also relies upon acts and statements of UMW field representatives and officers of Local 30 at coal mines and tipples throughout the area and upon the general pattern of mass picketing and violence. Even when viewed in a light most favorable to Ritchie we hold that this evidence does not constitute "clear, unequivocal, and convincing proof" under § 6 of the Norris-LaGuardia Act that UMW was responsible for the burning of the Ritchie tipple.

Reliance is also placed upon the evidence that the armed and masked men who held the guard at gunpoint and burned the tipple called the guard a "scab." This term had been used previously by pickets in referring to employees of non-contract operators. The word "scab" is commonly used by persons involved in labor disputes. The use of this term by the men who burned the tipple is not clear proof that the UMW participated in, authorized or ratified the act.

The standard of proof created by § 6 is indeed a difficult one, especially in a situation involving hundreds of pickets spread over a large geographical area.

Congress intended that the standard of proof be more difficult than in the ordinary civil case. In *Gibbs*, the Court said:

> "What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force." 383 U.S. at 739, 86 S.Ct. at 1146.

In order to satisfy § 6 there must be evidence showing some definite and substantial connection between the UMW and the destruction of the tipple. We are unable to find any such evidence in the present record.

We therefore hold that the verdict of the jury on the claim arising under the common law of Kentucky is not supported by clear proof.

### 4) Secondary Boycott

■ Ritchie claims that the picketing of its tipple amounted to a secondary boycott in violation of § 303 of LMRA. (N. 1, *supra*.) UMW contends on this appeal that the evidence presented did not warrant the submission of this issue to the jury. We conclude that the record contains substantial evidence to support a jury finding that there was a secondary boycott within the meaning of § 303. "Faced with the complexity of numerous picketings at separated and inaccessible mine locations, defendant chose the simpler course of closing the outlet provided for the numerous producers * * *." Sunfire Coal Co. v. UMW, *supra*, 313 F.2d at 110.

■ In the present case the outlet sought to be closed by the pickets was the Ritchie tipple. The record is sufficient to support a conclusion by the jury that the primary objective of the UMW in this strike was to get the coal producers to sign the contract with the Union, and that picketing Ritchie was secondary activity aimed at accomplishing this objective. UMW undertook to force Ritchie, as a customer of the mines, to cease handling the product (coal) of the primary employers (the coal mines). This activity is squarely within the meaning of secondary boycott. Local 761, International Union of Electrical, Radio & Machine Workers v. N.L.R.B., 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592.

■ UMW contends that the activities at Ritchie's tipple were primary picketing aimed at persuading Ritchie's three employees to join the Union. A jury would be justified in refusing to believe that from 500 to 1,000 pickets were massed on Ritchie's property for the sole purpose of obtaining three new Union members or with the objective of organizing the three employees of this tipple.

In Flame Coal Co. v. UMW, *supra*, this Court said:

> "This union cannot escape the charge of secondary boycott because it chose to attack on all fronts at once, claiming its desire and objective to be the organization of all involved, whether producers, transporters or processors of coal. United Mine Workers of America v. Osborne Mining Co., [6 Cir.] 279 F.2d 716, 723." 303 F.2d at 42.

■ The record contains proof that UMW representatives instructed the pickets that they must stop the coal from moving in order to get the mine operators to sign the contract. Interference with Ritchie's operations, harassing truck drivers and forcing them to dump their loads of coal on the highway, and picketing the railroad at the entrance of the Ritchie tipple was not permissive primary picketing but secondary picketing aimed at forcing the mine operators to sign the contract. Riverside Coal Co., Inc. v. UMW, *supra*; Sunfire Coal Co. v. UMW, *supra*; Flame Coal Co. v. UMW, *supra*; Gilchrist v. UMW, 290 F.2d 36 (6th Cir.), cert. denied, 368 U.S. 875, 82 S.Ct. 120, 7 L.Ed.2d 76; UMW v. Osborne Mining Co., 279 F.2d 716 (6th Cir.), cert. denied, 364 U.S. 881, 81 S.Ct.

169, 5 L.Ed.2d 103; UMW v. Meadow Creek Coal Co., Inc., 263 F.2d 52 (6th Cir.), cert. denied, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038. UMW contends that the latter four cases were overruled by United Mine Workers v. Gibbs, *supra*. We disagree with the contention.

 It is to be re-emphasized that the clear proof standard of § 6 of the Norris-LaGuardia Act does not apply to a finding of secondary boycott under § 303 of the LMRA. Ritchie is required to prove by a preponderance of the evidence that the UMW was responsible for a secondary boycott at the tipple site. The record abounds in evidence that the mass picketing was sponsored and controlled by the UMW. There is substantial evidence to support a jury finding that UMW was responsible for the picketing that took place at the Ritchie tipple.

We accordingly hold that there is sufficient evidence of a secondary boycott in violation of § 303 of LMRA for submission of this issue to the jury.

### 5) Damages

 Punitive damages cannot be recovered for claims arising under § 303 of LMRA. United Mine Workers v. Gibbs, *supra*. Punitive damages can be recovered, however, for the State law claim if the clear proof standard of § 6 of the Norris-LaGuardia Act has been met. United Mine Workers v. Gibbs, *supra*. Since we have held that this standard was not met, award of punitive damages against UMW cannot stand. This brings us to the question of damages with regard to the destruction of the tipple and loss of profits.

The record discloses that most of the proof of damages presented by Ritchie was related to the period of time beginning with the destruction of the tipple. These damages included the value of the tipple structure itself and the resulting loss of anticipated profits due to the inability to operate without a tipple. Under the facts of this case these two elements of damages are related to the burning of the tipple and not to the secondary boycott.

Although we find evidence in the record of damages suffered by Ritchie as a result of the secondary boycott, the jury limited its verdict for actual and compensatory damages to the value of the tipple and the subsequent loss of income found to have resulted from its destruction.

Illustrative of damages sustained by Ritchie due to the secondary boycott, Manius Halcomb, a coal mine operator, testified that he ran less coal to Ritchie during the period from March 16, 1959, through October 5, 1959, than prior to that time. Bradley Breeding, who had operated four coal trucks to the tipple, said he quit hauling to Ritchie's "because I just didn't want to get involved in that picket bunch down there." Edgar Whitaker, an employee at Ritchie's, testified that because of pickets: "Well, there was so many of them, we had no alternative. We just quit work * * *. [A]ll the other operations had been closed down."

 In the event of a new trial under § 303 of the LMRA we hold that proof of damages should be limited to those which are the direct and proximate result of the secondary boycott. Gilchrist v. UMW, *supra*. The secondary boycott took place during the time of picketing. All picketing had ceased April 30, 1959, long prior to the burning of the tipple.[6] Thus under the facts of this case, the loss of the tipple and the resulting loss of profits are not a part of the measure of damages against the UMW resulting from the secondary boycott.

Reversed and remanded.

EDWARDS, Circuit Judge (concurring in part; dissenting in part).

I concur with the result reached by the court, and I also join Judge Phillips'

---

6. The burning of the Sunfire tipple, described at 313 F.2d 108, 109, for which recovery was allowed, took place while mass picketing was at its peak.

opinion in all respects except that of the secondary boycott issue.

As I understand this record, Ritchie was the operator of a coal tipple with whom the United Mine Workers had a lawful primary labor dispute. The fact that this record discloses illegal mass picketing of Ritchie's tipple or illegal violence at or near it certainly bears upon the common law conspiracy charged in this case. But such facts do not change a primary labor dispute into a secondary boycott. See my dissenting opinion in Riverside Coal Co., Inc. v. UMW (Jessup v. United Mine Workers), 410 F.2d 267 (6th Cir. 1969). Nor do I believe either, in the instance of a strike by an industrial union against a number of coal operators, that the fact that picketing at one operation might affect other struck operations serves to change primary activity into secondary activity.