ABREEN CORP., Plaintiff, Appellee,

v.

LABORERS' INTERNATIONAL UNION, N.A., AFL, AFL–CIO, Defendant, Appellant.

ABREEN CORP., Plaintiff, Appellee,

v.

LABORERS' INTERNATIONAL UNION, N.A., AFL, AFL–CIO, et al., Defendants, Appellees.

Massachusetts Laborers' District Council, Defendant, Appellant.

ABREEN CORP., Plaintiff, Appellee,

v.

LABORERS' INTERNATIONAL UNION, N.A., AFL, AFL–CIO, et al., Defendants, Appellees.

Laborers' Local 609, Defendant, Appellant.

Martin BERNARD, et al., Plaintiffs, Appellees,

v.

LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, Defendant, Appellant.

Martin BERNARD, et al., Plaintiffs, Appellees,

v.

LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, et al., Defendants, Appellees.

Laborers' Local 609, Defendant, Appellant.

Martin BERNARD, et al., Plaintiffs, Appellees,

v.

LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, et al., Defendants, Appellees.

Massachusetts Laborers' District Council, Defendant, Appellant.

ABREEN CORP., Plaintiff, Appellant,

v.

LABORERS' INTERNATIONAL UNION
OF NORTH AMERICA, AFL–CIO, et
al., Defendants, Appellees.

Martin BERNARD, et al., Plaintiffs,
Appellants,

v.

LABORERS' INTERNATIONAL UNION
OF NORTH AMERICA, et al.,
Defendants, Appellees.

Nos. 82–1149 to 82–1151, 82–1158 to
82–1160, 82–1191 and 82–1206.

United States Court of Appeals,
First Circuit.

Argued Oct. 5, 1982.

Decided June 14, 1983.

As Modified on Denial of Rehearing and
Rehearing En Banc July 28, 1983.

Paul F. Kelly, Boston, Mass., with whom Segal, Roitman & Coleman, Boston, Mass., was on brief, for Laborers' Local 609.

Theodore T. Green, Asst. Gen. Counsel, Washington, D.C., with whom Harold B. Roitman, Segal, Roitman & Coleman, Boston, Mass., and Robert J. Connerton, Washington, D.C., were on brief, for Laborers' Intern. Union of North America, AFL–CIO.

Robert P. Corcoran, Boston, Mass., with whom Stoneman, Chandler & Miller, Boston, Mass., was on brief, for Abreen Corp.

Laurence J. Donoghue, Boston, Mass., with whom Deutsch, Weintraub & Glazerman, P.C., Boston, Mass., was on brief, for Martin Bernard and Isadore Wasserman.

Richard W. Coleman, Sharon M. Livesey and Segal, Roitman & Coleman, Boston, Mass., on brief, for Mass. Laborers' Dist. Council.

Before PECK,* Senior Circuit Judge, CAMPBELL and BREYER, Circuit Judges.

* Of the Sixth Circuit, sitting by designation.

LEVIN H. CAMPBELL, Chief Judge.

This labor case requires a resolution of difficult questions concerning illegal secondary activity, and a determination of the extent and amount of liability for such activity. The facts as found by the district court are as follows:

In August 1978 Martin Bernard and Isadore Wasserman secured rights to construct a shopping mall and a Hilton Hotel in Natick, Massachusetts. They contracted with Abreen Corporation ("Abreen"), a Massachusetts general contractor, to perform construction of the project. In the summer of 1978 work began on the project.

On March 19, 1979, Laborers' Local 609 ("Local 609") began picketing a subcontractor, Seppala and Aho ("S & A") at the Abreen work site, protesting its nonunion status and arguing it should pay area standard wages. In response, Abreen established a separate gate (Gate 1) for S & A workers and a second gate (Gate 2) for all other subcontractors.[1] During the week of March 19, 1979, Local 609 confined its picketing to Gate 1.

During the second week of picketing, Local 609 continued to picket Gate 1, but also occasionally picketed Gate 2. On one occasion a Rosenfeld truck delivering concrete for a neutral supplier was stopped at Gate 2 by Local 609 picketers and Maurice Blumberg, a field representative of Massachusetts Laborers' District Council ("MLDC"), along with several other District Council members. The district court also found that Blumberg threatened to "shoot [the] head off" a truck driver who attempted to make a delivery through Gate 1 and threatened to send a photograph to the local union of a truck driver delivering to suppliers of a plumbing subcontractor through Gate 1. At one stage Blumberg shouted to an Abreen official, Philip Abrams, that the project "would never finish nonunion."

On March 25, 1979, Arthur Coia, Vice President of Laborers' International Union of North America ("IU") placed a telephone call to Aldo Baretta, Vice President of Durastone Flexicore ("Durastone"), supplier of cement planks which S & A was to install for flooring in the project. In the telephone call Coia commented that if Durastone delivered its shipments of cement planks to the project, "there would be a problem," since Durastone's truck drivers would face a picket line. The district court found that as a result of the phone call Durastone cancelled the shipment of planks. Previously, Raymond Baretta, the Plant Manager of Durastone, had been told by the local shop steward that Durastone employees, who were represented by Local 315 of Laborers' International, would not load trucks going to the Natick site. A few days later unidentified picketers led by the Business Agent of Local 609 appeared at Durastone's plant. The record is unclear exactly when this picketing occurred. On March 27, 1979, however, Abreen sent trucks to the Durastone plant to pick up the material. Durastone employees refused to deliver the materials. Abreen then contracted with another supplier.

On March 26, 1979, additional pickets appeared at Gate 2 of the Natick site carrying "minority" picket signs. These pickets failed to direct their protests at any particular employer. These picketers protested the treatment of blacks and other minorities at the work site, contending that they deserved higher wages. On March 27, James Merloni, Jr., Vice President of Local 609, was present at both gates and removed a minority worker's sign from the trunk of his car and gave it to an individual who began picketing at Gate 2. Later that day Merloni directed a "minority workers" picketer to a point between Gate 1 and Gate 2.

During the week of April 2, picketing continued exclusively at Gate 1. On April

1. Abreen actually established three gates at its work site. The third gate was used to isolate nonrelated picketing situations between other subcontractors and their workers. This picketing is irrelevant for purposes of this case. For purposes of this opinion, Gate 1 is S & A's reserve gate, and Gate 2 is the neutral entrance used by other subcontractors at the Abreen site.

16, 1979, Abreen shut the work site down for Patriot's Day, an unscheduled holiday, as requested by the Natick police. Local 609 held a rally featuring speeches at the work site, urging S & A workers to unionize. Thereafter, picketing was only sporadic.

After the project was completed in March 1980, Abreen and Bernard and Wasserman both instituted suits against the three unions, Local 609, MLDC and IU, alleging damages as a result of illegal secondary picketing at the job site. In November 1981, the district court joined both cases and set a trial date. On December 16, 1981, after a four-day trial, the court found that illegal secondary picketing had occurred and held all three unions jointly and severally liable. The district court awarded Abreen $120,264.38 and Bernard and Wasserman $55,102.76 in damages. All parties appealed.

On appeal each union disclaims liability and in the alternative contends that the district court's damages award was excessive. Further, they argue Bernard and Wasserman did not have standing to sue under section 303 of the Labor Management Relations Act of 1947, 29 U.S.C. § 187 ("LMRA"). On the other hand, Bernard and Wasserman argue they have standing to sue and join with Abreen in contending their damages award was insufficient.

We hold Bernard and Wasserman have standing to sue in this case. We affirm the determination of the district court that Local 609, IU and the MLDC violated section 303. We find erroneous, however, several aspects of the district court's award of damages.

## I. STANDING TO SUE

Appellant unions initially contend that Bernard and Wasserman, acting through the Natick Village Mall Associates ("NVMA") lacked standing to sue under section 303 of the LMRA. They allege the organization was formed over a year after the events of this case, that the injury to NVMA was remote and indirect, and that

the zone of interest protected by section 303 did not encompass NVMA. We disagree.

■ NVMA was formed twelve months after the crucial events in this case, but it was only an alter ego of SN Realty Trust with Bernard and Wasserman as its general partners. All of the assets, including the land and other rights affected by this case, were transferred to NVMA. We, therefore, find the difference in legal entities unimportant in this case. *See Abbott v. Local Union 142,* 429 F.2d 786 (5th Cir.1970). The key question is whether Bernard and Wasserman, as developers, have standing under section 303.

■ In *W.J. Milner & Co. v. IBEW, Local 349,* 476 F.2d 8 (5th Cir.1973), the court, with the caveat that the list was not exhaustive, proffered three circumstances where a court could find a third party was sufficiently affected by a union's illegal secondary picketing to sustain liability: (1) where it was established the third party was part of an integrated business with either a neutral or the primary employer; (2) where the third party was directly injured by the actions of the union; and (3) where a principal-agent relationship was shown between the third party and primary employer. *Id.* at 12. In this case illegal picketing which adversely affected Abreen reasonably could be foreseen to adversely affect Bernard and Wasserman. *W.J. Milner,* 476 F.2d 8 (where sales agent of primary employer directly in line of fire of secondary boycott, and injury to such agent reasonably foreseeable by union, standing established under section 303); *Pennsylvania R.R. Co. v. National Maritime Union,* 206 F.Supp. 797 (E.D.Pa.1962) (third party has standing to sue where union's object in illegal secondary picketing injured third party just as it had hoped to). The district court was correct, therefore, in finding that Bernard and Wasserman had standing to bring suit under section 303.

■ Alternatively, several courts have held that where a third party is the owner of property allegedly injured by illegal secondary activity, this is a sufficient basis for

bringing suit under section 303. *Allentown Racquetball & Health Club, Inc. v. Building & Construction Trades Council,* 525 F.Supp. 156 (E.D.Pa.1981) (owner of health club had standing to sue under section 303 for damages resulting from secondary picketing at construction site); *Pennsylvania R.R. Co.,* 206 F.Supp. 797 (owner of ore unloading facility had standing under section 303 where object and purpose of illegal secondary picketing affected him). In this case, as in *Allentown* and *Pennsylvania R.R. Co.,* Bernard and Wasserman were the owners of the construction site. Further, it was alleged that the object of Local 609's picketing was to impede construction at the site. We hold, therefore, that the owners of a construction site who allege that they were directly injured by illegal secondary picketing, have standing to sue under section 303.[2]

## II. LIABILITY OF THE DEFENDANTS

Appellant Local 609 contends on appeal that the district court erred in finding a violation of section 8(b)(4)(ii)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(ii)(B).[3] We disagree.

Section 158(b)(4)(ii)(B) states,

(b) It shall be an unfair labor practice for a labor organization or its agents—

\*      \*      \*      \*      \*      \*

(4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\*      \*      \*      \*      \*      \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

This section expressly proscribes secondary activity by unions but allows them to engage in primary activity. It has been said that the distinction between primary and secondary activity depends upon "the object of the union's picketing." *Allied Concrete, Inc. v. NLRB,* 607 F.2d 827 (9th Cir.1979). *See Electrical Workers v. NLRB,* 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); *NLRB v. Denver Building Council,* 341 U.S. 675, 689, 71 S.Ct. 943, 951–52, 95 L.Ed. 1284 (1951); *see also Pickens-Bond Construction Co. v. United Brotherhood of Carpenters Local 690,* 586 F.2d 1234 (8th Cir.1978); *Carpenters District Council of Southern Colorado v. NLRB,* 560 F.2d 1015 (10th Cir. 1977); *T.W. Helgesen, Inc. v. International Association of Bridge, Structural, & Ornamental Ironworkers, Local 498,* 548 F.2d 175 (7th Cir.1977). If the object of the union's conduct is to put direct pressure on the

---

**2.** After argument was heard in this case the Supreme Court issued its opinion in *Associated General Contractors v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Local 609, in a supplemental memorandum of law, argues that the Supreme Court's decision requires us to find that Bernard and Wasserman lack standing. We disagree. In *Associated General Contractors* the Supreme Court held that a union could not sue under the Clayton Act for damages resulting from alleged coercion of an employer organization of certain third parties without a direct showing of injury to itself. In reaching its decision the Court relied upon the fact that

antitrust laws were designed to protect consumers and competitors from anticompetitive practices, and that unions, which typically serve to restrain competition, do not fall within the law's protected zone of interest. The Court further noted that union-management relations were governed by the national labor law. None of these factors are present here. Accordingly, we do not find *Associated General Contractors* to be controlling.

**3.** Under section 303 a union may be found civilly liable for violations of section 8(b)(4) of the NLRA.

employer with whom the union has a dispute, the conduct is primary and lawful. *See Allied Concrete, Inc. v. NLRB,* 607 F.2d at 830. If, on the other hand, the object of the union's conduct, taken as a whole, is to bring indirect pressure on the primary employer by involving neutral or secondary employers in the dispute, the conduct is secondary and prohibited. *Id.* Often, of course, the union will have more than one goal, but so long as an object of the conduct is secondary, the conduct is unlawful. *NLRB v. Denver Building Council,* 341 U.S. at 689, 71 S.Ct. at 951–52; *Texas Distributors, Inc. v. Local Union No. 100, United Association of Journeymen,* 598 F.2d 393 (5th Cir.1979); *Pickens-Bond Construction Co. v. United Brotherhood of Carpenters Local 690,* 586 F.2d at 1241.

■ As a practical matter, the object of the union's actions must be determined by analyzing the nature of the union's conduct to see whether the pressure being put on other employers is occurring merely incidentally to the pressure imposed on the primary employer, or directly with the central goal of involving the secondary employer in the dispute. This analysis of the union's conduct always involves difficult factual determinations, but the inquiry is particularly difficult in cases such as this one involving a common situs, where the union's actions can be seen as directed at either the primary employer or the secondary employer. *T.W. Helgesen, Inc. v. International Association of Bridge, Structural, & Ornamental Ironworkers, Local 498,* 548 F.2d 175 (7th Cir.1977). To aid in the line-drawing necessary in such cases, the National Labor Relations Board in *Sailor's Union of the Pacific (Moore Dry Dock),* 92 NLRB 547 (1950), set forth a four-part test. Under that test, picketing of a common situs will be presumed primary if

1) the picketing is strictly limited to times when the primary employer is at the situs;

2) the picketing is limited to times when the employer is engaged in work at the situs;

3) the picketing is limited to places reasonably close to location of the employer;

4) the picketing clearly identifies that the dispute is with the primary employer.

The *Moore Dry Dock* test, however, is merely "an evidentiary tool." *International Association of Bridge, Structural, & Ornamental Ironworkers, Local 433 v. NLRB,* 598 F.2d 1154, 1157 (9th Cir.1979); *see also Carpenters District Council of Southern Colorado v. NLRB,* 560 F.2d 1015. R. Gorman, *Labor Law* at 251. If the trier of fact finds that in the totality of circumstances the union's actions put impermissible direct pressure upon a secondary employer, the union may be found liable despite literal compliance with the *Moore Dry Dock* standard. *See, e.g.,* 598 F.2d at 399; 560 F.2d at 1015.

■ The pivotal issue, in any case, is the union's intent. This factual question is primarily for the district court to decide. *Pickens-Bond Construction Co. v. United Brotherhood of Carpenters Local 690,* 586 F.2d at 1234. Often, as here, the evidence will be conflicting and confused, and the inferences to be drawn susceptible of more than one interpretation. The district court's "[s]election among permissible inferences raised" will only be overturned on appeal if it is clearly erroneous. *Id.* at 1240.

### A. *Local 609's Liability*

■ We do not find the district court's conclusion that Local 609's picketing was unlawful secondary activity to be clearly erroneous. When picketing will potentially involve neutral parties, the union has an obligation to "picket with restraint" and make sure that its actions do not put undue pressure on secondary employers. *Allied Concrete, Inc. v. NLRB,* 607 F.2d 827, 830 (9th Cir.1979). In the instant case, there was considerable evidence that the union did not do that. Although the union claims to have only been engaged in lawful area standards picketing aimed at S & A,[4] there

---

4. Area standard picketing is picketing by a union to protest the fact that an employer is

nonunion and is paying below the wage rates established in the area by union pressure.

is evidence in the record from which the district court could conclude that the minority picketing was controlled by James Merloni, Vice President of Local 609. This picketing clearly violated the *Moore Dry Dock* standard in that the picketing was conducted at the neutral gate and the signs failed to identify both the union behind the picketing and at whom the picketing was directed.

■ The minority picketing was but one of several actions from which the district court could conclude that the union's actions at Natick put unlawful pressure on neutral employers. There was evidence that Maurice Blumberg, field representative of the District Council, who participated in much of the picketing activity, told Abreen officers that the job would not finish "nonunion." From this statement the district court could infer that the unions tried to pressure Abreen to cease dealing with nonunion subcontractors. *See Pickens-Bond Construction Co. v. United Brotherhood of Carpenters Local 690,* 586 F.2d 1234 (8th Cir.1978) (secondary objective can be inferred from union official's comment that picketing would stop when nonunion subcontractor left the job site).

■ Evidence also established that the unions put impermissible pressure on third parties besides Abreen. Members of Local 609 carried unidentified pickets in front of the Durastone plant in Rhode Island. Durastone was a supplier of S & A, the primary employer. Deliveries of suppliers traditionally are seen as "occupying a middleground in the spectrum of permissible activity under 8(b)(4)." *Linbeck Construction Corp. v. NLRB,* 550 F.2d 311, 316 (5th Cir. 1977). Some appeals to them, such as by an identifiable picket sign at the primary employer's gate, are permissible as incidental to the pressure on the primary employer. *See United Steelworkers of America v. NLRB (Carrier Corp.),* 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964); *Local 761, International Union of Electrical Workers v. NLRB,* 366 U.S. 667, 81 S.Ct. 1285, 6

L.Ed.2d 592 (1961). And at least one court has held that unions may supplement a picket line by making limited requests off the site to those who would normally encounter the line to honor it. *Anchortank, Inc. v. NLRB,* 601 F.2d 233, 240 (5th Cir. 1979). In this case, however, Local 609's appeal to the Durastone employees was of a far different sort. There was no simple request to honor the picket line at Gate 1; there was instead unidentified picketing at the Durastone plant. This may reasonably have been interpreted by the district court as an attempt to stir up trouble at Durastone to pressure it not to deal with Abreen and S & A. Such conduct goes beyond the scope of permissible involvement of secondary employees.

■ Evidence at trial also supported the district court's conclusion that Local 609, often with the aid of Maurice Blumberg of the District Council, made impermissible appeals to neutral employees at the Natick site. The record shows that at least one of the trucks Local 609 stopped at Gate 1 was not a truck of an S & A supplier, and that the union officials knew that. While the union had a right to picket at Gate 1, it had no right to threaten to take the photograph of a driver known not to be delivering supplies to S & A.

The district court also found that the main picket line sometimes moved to Gate 2 and at one point prevented a concrete truck from entering the site through that gate. The truck, according to unrebutted testimony, was not supplying S & A. Appellants argue they had a right to stop it anyway because it was a concrete truck and S & A was a concrete subcontractor. *See J.F. Hoff Electric Co. v. NLRB,* 642 F.2d 1266, 1271 (D.C.Cir.1980), *cert. denied,* 451 U.S. 918, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981). There is no evidence in the record, however, that the picketers ever sought to ascertain if the truck was destined for S & A, or even that they actually believed it was an S & A supplier. Given these facts, and the other

Such picketing, if properly conducted, is lawful. *See, e.g., NLRB v. International Brotherhood of*

*Electrical Workers, Local 265,* 604 F.2d 1091, 1097 (8th Cir.1979).

evidence in the case including Local 609's activity at Gate 2 in the guise of minority picketing, we think the district court could permissibly infer that the incident evidenced Local 609's desire to involve neutrals in the dispute. Accordingly, while we might hesitate to uphold a finding of liability based upon only one of the many incidents discussed above, we believe that given the various unlawful actions, the district court did not commit clear error in finding that the union's course of conduct was unlawful.

### B. Liability of the MLDC and IU

Both the MLDC and the International argue that the district court erred by finding them jointly and severally liable with Local 609. We disagree.

An international or regional affiliate of a local union may not be liable for the local's unfair labor practices merely by virtue of its affiliation with the local. *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). The regional or international, however, may be liable if it either has an agency relationship with the local, *id.*, or independently participates in the local's illegal conduct. *Cf. id.* at 213, 100 S.Ct. at 412 (international cannot be liable when it has neither instigated, supported, ratified or encouraged union's unlawful activity); *United Mine Workers v. Gibbs*, 383 U.S. 715, 735, 86 S.Ct. 1130, 1143, 16 L.Ed.2d 218 (1966) (same); *NLRB v. Local 1016, United Brotherhood of Carpenters*, 273 F.2d 686 (2d Cir. 1960) (same). Here, there was sufficient evidence of the District Council and International's participation in and support of the unlawful conduct to hold them jointly and severally liable with the local.

The record shows that MLDC representative Blumberg was actively involved in the illegal conduct. He appeared at the construction site on numerous occasions. The district court found that on March 28, Blumberg participated in the picketing of Gate 1 and threatened to shoot the head off a trucker attempting to enter through the gate. On March 29, he joined the picketing at Gate 2 and on occasion helped turn away a neutral concrete supplier. Blumberg also commented to an Abreen official that the "job would never finish non-union." Given all of these facts, the district court did not err in finding that the MLDC, through its agent Blumberg, participated in the unlawful activity.[5]

The International's relationship to the illegal conduct poses a more difficult question. The only contact IU had with the picketing was the telephone call from IU's Vice President Arthur Coia to Vice President Baretta of Durastone the day before the secondary activity began. The question here is whether the district court could supportably find that Coia's phone call constituted participation in the illegal conduct. While the question is close, we think that the answer is yes.

Unions may make peaceful appeals for support from the management of companies dealing with the primary employer, *NLRB v. Servette, Inc.*, 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964). Unions may not, however, threaten other employers, including suppliers, with secondary activity. *See NLRB v. Local 307, Plumbers*, 469 F.2d 403 (7th Cir.1972); *NLRB v. Plumbers Union, Local 457*, 299 F.2d 497 (1962). If Coia's phone call to Baretta constituted such a threat on behalf of Local 609, IU could be found to have participated in Local 609's illegal con-

---

5. The MLDC argues that it should not be liable for Blumberg's actions because there was no evidence that his superiors were aware of his conduct. The record shows, however, that Blumberg was an employee of the District Council and was given a significant amount of discretion in carrying out his job. From these facts and the amount of time Blumberg spent at the site, the district court could reasonably infer that Blumberg was acting in his capacity as agent of MLDC. This conclusion is further supported by the fact that the President of MLDC spoke at a rally on behalf of Local 609. This permitted an inference that the District Council's highest officers were supporting Local 609 and were likely aware of Blumberg's actions on behalf of the local.

duct and be jointly and severally liable for the plaintiffs' damages.

We considered a phone conversation similar to Coia's in *NLRB v. Local 254, Building Service Employees,* 359 F.2d 289 (1st Cir. 1966). In that case the union was involved in a collective bargaining dispute with University Cleaning Company, which furnished cleaning and janitorial services to various customers in the Boston area, including United Airlines and the Great Atlantic & Pacific Tea Company (A & P). Union officials telephoned the management of both United Airlines and the A & P informing them that the union would picket University Cleaning at their respective offices the next day. Pickets then appeared the next day. Despite the fact that union officials had only one brief conversation with A & P officers and that no express threats were made, we found that the Board was justified in finding the conversation an unlawful threat to force A & P to cease doing business with University Cleaning. We noted that

> The language used must be taken in the circumstances surrounding the case. Words harmless in themselves can take on a sinister meaning in the context in which they are used.... For one thing, there was a labor dispute going on between the Union and University and that alone puts the activities of the Union with reference to University's customers in a different light. The implications of the conversation are clear.

*Id.* at 291 (citations and footnotes omitted).

In the instant case, Baretta testified that the tone of his conversation with Coia was friendly and the district court did not expressly hold that Coia's conversation constituted a threat. From these facts appellants argue that the district court held IU liable merely because of the fact that the International was affiliated with the local. We do not think this is a fair reading of the district court's opinion. The court found that "It makes no difference if the tone of the call was friendly; the message was clear—the pre-cast concrete was not to be delivered—and the message had the desired ef-

fect." In other words, the district court reached a similar conclusion to that reached by the Board in *Local 254.* The court found that despite the tone of the phone call, Coia was implicitly threatening Baretta with economic pressure if Durastone delivered the pre-cast concrete. The context in which the call was made supports this interpretation. Although the mere fact of affiliation is insufficient to assess liability, the district court was not required to ignore the relationship among the parties in construing the meaning of Coia's conversation. Given the fact that IU was affiliated with both Local 609 and the local that represented Durastone's own employees, it was not unreasonable for the district court to infer that Coia was conveying a veiled threat to Durastone of labor trouble unless it honored Local 609's picket lines. This inference is further supported by the fact that Durastone's own employees had previously stated their refusal to deliver to the Natick site. Therefore, at the time of the phone call, Durastone would have been aware of the sympathies of its own employees and would have felt vulnerable to pressure exerted by IU. Moreover, Baretta testified that he had had some problems with Coia in the past. Accordingly, we cannot say that the district court erred in finding the International jointly and severally liable for Local 609's and MDLC's illegal conduct.

## III. DAMAGES

Appellant labor unions contend the award of damages by the district court both to Abreen and to Bernard and Wasserman was improper. On the other hand, Abreen argues it should have received compensation for lost wages, lost business profits and attorneys' fees. Bernard and Wasserman seek additional sums for their attorneys' fees and compensation for lost wages of officials who had to deal with problems resulting from the picketing. We affirm the district court's award of damages in part and reverse in part.

### A. *Abreen*

In order to receive damages under section 303 a plaintiff must demonstrate that the

damages occurred "by reason of" the unlawful conduct. *Local 20, Teamsters Union v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). In the instant case appellants argue that the district court erred in awarding damages to Abreen because there was no evidence that the damages resulted from the unions' unlawful conduct. We disagree.

The district court awarded Abreen $85,519.88 for losses incurred as a result of Durastone's failure to supply concrete planks. The district court found that Durastone cancelled its shipment of planks to Natick because of Coia's phone call to Baretta. After the shipment was cancelled, Abreen then sent trucks to Durastone's plant. Durastone employees refused to load the trucks. Consequently, Abreen was forced to find substitute suppliers. From this sequence of events, the unions argue that there was no causal connection between Abreen's damages and any illegal conduct.

We think the unions' argument depends on an overly narrow conception of secondary activity. It presumes that the only activities which are prohibited, and hence for which the union may be liable, are those particular actions which so clearly impose impermissible pressure upon a secondary employer that they would be found illegal under all circumstances. What this analysis ignores is that the trier of fact must look at the totality of circumstances, *see, e.g., International Association of Bridge, Structural, & Ornamental Ironworkers, Local 433 v. NLRB,* 598 F.2d 1154 (9th Cir.1979); *Carpenters District Council of Southern Colorado v. NLRB,* 560 F.2d 1015 (10th Cir.1977), and that where a substantial portion of a union's conduct is undeniably secondary, the trier of fact may conclude that the activity as a whole had an unlawful object and illegally pressured secondary employers. Accordingly, the fact that certain losses may not have resulted directly from the specific acts which evidenced the unions' unlawful intentions is irrelevant so long as the losses are traceable to actions forming part of the overall secondary activity. *But see Riverside Coal Co. v. United Mine Workers,* 410 F.2d 267, 275 (6th Cir.) (damages may be assessed only for losses resulting from the specific acts of conduct that are clearly unlawful), *cert. denied,* 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969).

In the instant cases our review of the record convinces us that the district court did not err in finding that the concrete planks were not available to Abreen as a result of the picketing at the Natick site which was unlawful. Even if the final "intervening factor" in the causal chain here was the refusal of Durastone employees to load the Abreen trucks, the court could supportably find on this record that that refusal resulted from Local 609's unlawful activities in Natick.[6]

Moreover, this is not a case in which losses were incurred merely as a result of employees of a supplier independently deciding to honor a lawful picket line. Direct and unlawful pressure was put upon Durastone. *See supra.* This pressure upon Durastone might well have contributed substantially to Durastone's employees' refusal to load the Abreen truck. *See Mead v. Retail Clerks International Association, Local 839,* 523 F.2d 1371, 1377 (9th Cir. 1975). On this record, we cannot find that the district court erred in attributing the $85,519.88 in damages to the unlawful activity.

Appellants also challenge the district court's award of $5,165 for costs incurred when Henly Lundgren failed to haul gravel to and from the work site as he had agreed to do. We do not think that the district court was clearly erroneous in finding that these costs were a result of the union's unlawful conduct. Evidence at the trial showed that Lundgren did not haul the gravel because of the picket lines. As not-

---

6. The refusal may also have occurred as a result of Local 609's picketing of the Durastone plant. The record is unclear, however, as to when that picketing occurred in relationship to the refusal to load the Abreen trucks. *See supra.*

ed above, the district court did not have to find that Lundgren's refusal stemmed directly from one of the acts which evidenced the union's unlawful intentions in order to award damages. The fact that the refusal to deal resulted from the picketing during the period in which it was illegal was sufficient to sustain the award of damages.

▆▆▆ We agree with appellants, however, that the district court erred by awarding $7,935 in attorneys' fees for expenses incurred in efforts to stop the picketing. In *Summit Valley Industries v. Local 112, United Brotherhood of Carpenters,* 456 U.S. 717, 102 S.Ct. 2112, 72 L.Ed.2d 511 (1982), the Supreme Court held that the American Rule applied and that in the absence of bad faith on the part of the defendants, plaintiffs cannot recover attorneys' fees in section 303 actions for work done in successful litigation before the Board. Here there was no evidence that the defendants acted in bad faith. Nevertheless, Abreen argues that attorneys' fees should be allowable because the fees did not arise from actual litigation before the Board.[7] We do not think that fact serves to meaningfully distinguish this case from *Summit Valley*. In both *Summit Valley* and the instant case the attorneys' fees were incurred in order to achieve the termination of unlawful picketing. The fact that the picketing stopped in the present case before the Board heard the case provides no reason for granting attorneys' fees.

▆▆▆ We similarly find that the district court erred in awarding Abreen $4,621 in photographic expenses. These expenses were incurred in order to obtain evidence for proceedings before the Board and the district court. They were, therefore, litigation expenses and not the kind of actual damages compensable under section 303. *See Summit Valley, supra.*

▆▆▆ On cross-appeal Abreen argues that the district court erred in refusing to award $3,300 in attorneys' fees for work done ne-

gotiating with Durastone. We agree with Abreen that these expenses which do not relate to attempts to terminate the picketing are compensable as actual damages. The fact that the $3,300 went to attorneys' fees does not distinguish these damages from other expenses incurred by Abreen when Durastone refused to supply the concrete planks. We therefore reverse the district court's refusal to award this amount.

We have examined the other issues relating to damages raised by the parties and find no other errors in the award to Abreen.

### B. *Bernard and Wasserman*

The district court awarded $55,102.76 in damages to Bernard and Wasserman. $1,185 of those damages were for attorneys' fees incurred in efforts to stop the unlawful picketing. For reasons discussed above, we reverse that portion of the award.

▆▆▆ Appellants argue that the district court erred in awarding damages for lost rental fees due to delay to the construction site. The record shows that one shop, K-Mart was ready for fixturing at the time of the picketing and that the fixturing trucks did not enter the site because of the picketing. The district court, therefore, did not err in awarding damages resulting from the delay to the K-Mart's opening. The evidence is much less clear as to the other shops. Bernard testified that the project as a whole was delayed for six months and that two months of that delay was due to the picketing. There was also testimony that the picketing caused considerable disruption to the entire site. From this evidence the district court concluded that the illegal picketing delayed the entire project by 21 days, the amount of time in which the K-Mart was delayed. Because damages in a section 303 action need not be proven with precision, *Abbott v. Local 142 of United Association of Journeymen,* 429 F.2d 786 (5th Cir.1970), we find that the district court did not err in awarding 21 days of lost rental income for the entire project.

---

**7.** The record is unclear whether Abreen ever brought a proceeding before the Board or merely planned to do so. The record shows, how-

ever, that some kind of settlement terminating the picketing was reached prior to the Board's taking any action.

We agree with the unions, however, that the district court erred in awarding $19,257 for additional financing charges caused by the delay to the construction. Damages in a section 303 action cannot be speculative. *Pickens-Bond Construction v. United Brotherhood of Carpenters Local 690*, 586 F.2d 1234, 1241 (8th Cir.1978). Here the only evidence supporting the award was Bernard's testimony that he could have refinanced the construction loans at lower interest rates had the project finished earlier. Bernard admitted, however, that he could not be certain about this. No other testimony or documentary evidence was offered to establish the availability of lower financing. Given the fact that the extent of the delay was itself unclear, we do not think that Bernard's conclusory and self-serving testimony was sufficient in itself to sustain the award of damages. We therefore reverse this part of the award.

We find no other errors in the district court's award of damages to Bernard and Wasserman.

*Affirmed in part and reversed in part.*

JOHN W. PECK, Senior Circuit Judge, concurring in part, dissenting in part.

Although I agree with most of the majority's well written opinion I must note my disagreement with the determination that Laborers' International Union of North America (IU) is jointly and severally liable for damages resulting from illegal secondary activity at the Abreen construction site. The district court's findings are far too tenuous to support such a conclusion.

The district court found IU liable based on its "participation" in illegal secondary picketing at the Abreen construction site and because of its "close relationship" with Local 609. In my view, neither basis is supported by law or the record in this case.

Courts faced with the question of whether an international union is liable for the acts of its local have employed concepts of agency law to resolve the issue. *Carbon Fuel Co. v. UMW*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979); *Coronado Coal Co. v. UMW*, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963 (1925). In *Carbon Fuel* the Supreme Court held that where an international did not instigate, support, ratify, or participate in an illegal wildcat strike, it was not liable to the employer injured by the action. *Supra* at 218, 100 S.Ct. at 414. Here, the district court found IU participated in illegal activity by Local 609 based solely on one phone call between Coia, Vice President of IU, and Baretta, Vice President of Durastone Flexicore. Both Coia and Baretta agreed the phone call was friendly and made to inform Baretta of the picket line at Gate 1, a picket line which Local 609 could lawfully establish. There is no evidence IU officials ever appeared at the work site nor was any other link with illegal secondary picketing shown. Courts have required far more before imposing liability on an international requiring actual participation in the illegal secondary activity itself. *Carbon Fuel, supra* at 217 n. 6, 100 S.Ct. at 414 n. 6; *United States Steel Corp. v. UMW*, 598 F.2d 363, 367 (5th Cir.1979); *NLRB v. Local 1016, United Brotherhood of Carpenters & Joiners of America*, 273 F.2d 686, 688 (2d Cir. 1960); *Nassau & Suffolk Building Trades Council (Theresa Gardens Apartments, Inc.)*, 162 N.L.R.B. 180, 190 (1966). Clearly the single telephone call made in this case falls short of constituting participation in order to impose liability on IU for the illegal actions of Local 609.

Arguably the district court may have held the phone call between Coia and Baretta was coercive and therefore constituted a violation of § 8(b)(4)(ii)(B). The majority apparently agrees primarily relying on *Local 254* to support its position. *NLRB v. Local 254, Building Service Employees*, 359 F.2d 289 (1st Cir.1966) (conversation between union officials and neutral employer coercive and threatening where made in context of veiled threat to engage in illegal secondary activity unless demands were met). Even if the district court did so hold in the present case, such a decision is clearly erroneous and unsupported by the record. Unlike *Local 254, supra,* the facts indicate

Coia and Baretta had been friends since 1950, rather than potential adversaries in a labor dispute. Both agree the phone call was friendly. As noted above, Coia was simply informing Baretta that his trucks would be facing a picket line the next morning which Local 609 legally could establish. Overall, unlike *Local 254, supra,* there is nothing to indicate from the circumstances of the telephone call that it was either intended as a threat or perceived as such.

The district court was clearly erroneous in holding that a "close relationship," sufficient to impose liability, existed between IU and Local 609. There is no evidence that the two unions in any way conspired or jointly conducted illegal activity. The unions were totally separate entities with no ties save traditional union affiliation. Without more, an international may not be held to answer for illegal conduct of its local. *Carbon Fuel, supra; UMW v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

In sum I think the district court plainly erred in holding IU liable to Abreen and Bernard and Wasserman. I would reverse the district court to this extent.