JOHN B. CRUZ CONSTRUCTION CO.,
INC., Plaintiff–Appellee,
Cross–Appellant,

v.

UNITED BROTHERHOOD OF CARPEN-
TERS AND JOINERS OF AMERICA,
LOCAL    33,    Defendant–Appellant,
Cross–Appellee.

Nos. 89–1835, 89–1923.

United States Court of Appeals,
First Circuit.

Heard Feb. 7, 1990.
Decided June 29, 1990.

Michael A. Feinberg, with whom Aaron D. Krakow, Christopher N. Souris, and Feinberg, Feld, Charnas & Schwartz, Boston, Mass., were on brief, for United Broth. of Carpenters and Joiners of America, Local 33.

Robert P. Corcoran, with whom Gleeson & Corcoran, Boston, Mass., was on brief, for John B. Cruz Const. Co., Inc.

Before BOWNES, Senior Circuit Judge, and TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

The United Brotherhood of Carpenters and Joiners of America, Local 33 ("Union"), brings this appeal and John B. Cruz Construction Co., Inc. ("Cruz"), a general contractor, brings a cross-appeal from a judgment entered by the United States District Court for the District of Massachusetts. The issues are complex and will be dealt with seriatim.

## I. FACTS

Cruz became involved in two joint ventures—one with Gilbane Building Co. ("Gilbane") and another with Barkan Construction Company ("Barkan"). Construction on the Gilbane/Cruz project began in February 1983. Between March and August, 1983, a Union representative visited Gilbane several times. On each occasion Gilbane was informed that Cruz had not yet signed a collective bargaining agreement ("CBA") and that unless Cruz signed such an agreement the Union would picket the Gilbane/Cruz project.

On August 11, 1983, representatives from Gilbane and Cruz met with the Union in an attempt to persuade the Union not to picket the Gilbane/Cruz project. The Union representative demanded not only that Cruz co-sign a CBA with Gilbane for the Cruz/Gilbane project, but also required that Cruz sign a separate CBA to cover all of Cruz' other projects. Cruz declined to do so.

On August 12, 1983, the Union picketed the Gilbane/Cruz project, effectively shutting down the job. As a result of the picketing, Cruz was forced to withdraw from the Gilbane/Cruz project.

Construction on the Barkan/Cruz project began in September, 1983. On several occasions between November 1983 and January 1984, a Union representative told Cruz that in order to be allowed to participate in the Barkan/Cruz project, Cruz would have to sign a CBA covering all of Cruz' construction as well as the Barkan/Cruz project. Again, the Union informed Cruz that unless an all-encompassing agreement was signed the Union would picket the Barkan/Cruz job site. The Union gave the same warning to joint venturer Barkan.

Thoresen Forms ("Forms") was a union subcontractor on the Barkan/Cruz project which employed carpenters who were represented by the Union. Forms was scheduled to began work on January 24, 1984. On January 25, 1984, a Union representative went to the job site and approached two of the union carpenters working for Forms, informed them that they were not supposed to be working on the job because Cruz was non-union, whereupon they abandoned the job site. Thereafter, Forms was unable to get carpenters referred to the Barkan/Cruz site until February 8, 1984, the day after Cruz withdrew from the project.

Cruz brought an action against the Union alleging that Cruz' withdrawals from the joint ventures were the result of unlawful secondary boycotts by the Union, and seeking recovery for lost profits. The district court entered judgment for Cruz in

connection with the Barkan/Cruz joint venture but denied relief for the Gilbane/Cruz project. Both parties appeal.

## II.   DISCUSSION

### A.   *Standards of Review*

Section 8(b)(4)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(B), makes it an unfair labor practice for a labor organization

> 4(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in a strike or a refusal in the course of his employment to ... perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in any industry affecting commerce, where in either case an object thereof is:
>
> (B) forcing or requiring any person ... to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9: Provided, That nothing contained in this clause (b) shall be construed to make unlawful where not otherwise unlawful any primary strike or primary picketing.

Essentially, this secondary boycott prohibition makes it unlawful for a union to bring indirect pressure on a primary employer by involving neutral or secondary employers. It is well settled that § 8(b)(4)(B) only prohibits this so-called "secondary" activity, not primary activity. *NLRB v. Denver Building & Construction Trades Counsel*, 341 U.S. 675, 686–687, 71 S.Ct. 943, 950–51, 95 L.Ed. 1284 (1951); *Abreen Corp. v. Laborers International Union*, 709 F.2d 748, 754 (1st Cir.1983).

The basic test for distinguishing between primary and secondary activity is whether the union's conduct was "addressed to the labor relations of the [employer against whom the pressure is exerted] *vis-a-vis* his own employees," *National Woodwork Manufacturers Association v.*

*NLRB*, 386 U.S. 612, 645, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967), and therefore primary, or whether the union's conduct against a neutral employer was "tactically calculated to satisfy union objectives elsewhere," *id.* at 644, 87 S.Ct. at 1268, and therefore secondary. In *Abreen* we elaborated upon this as follows:

> It has been said that the distinction between primary and secondary activity depends upon "the object of the union's picketing." If the object of the union's conduct is to put direct pressure on the employer with whom the union has a dispute, the conduct is primary and lawful. If, on the other hand, the primary object of the union's conduct, taken as a whole, is to bring indirect pressure on the primary employer by involving a neutral or secondary employer in the dispute, the conduct is secondary and prohibited.

709 F.2d at 754–55 (citations omitted). Thus, it is critical to determine the object of the union's activity. This analysis of the union's conduct involves factual determinations, primarily within the province of the district court. *Pickens–Bond Construction Co. v. United Brotherhood of Carpenters Local 690*, 586 F.2d 1234 (8th Cir. 1978). We review the district court's findings on appeal on a clearly erroneous standard. *Id.* at 1240. Turning to each construction project at issue and examining the facts in terms of the above standards, we affirm the district court.

### B.   *The Gilbane/Cruz Project*

Cruz contends that Gilbane was neutral and simply one of two separate and unrelated contractors attempting to do business. The Union's conduct disrupted the business relationship between Gilbane and Cruz. Cruz argues that the Union's conduct not only forced Cruz to withdraw from the project, but forced Gilbane to stop doing business with Cruz as well. Cruz avers that the Union's conduct was in furtherance of a dispute the Union had with Cruz alone over work other than the Gilbane/Cruz project. Since it was undisputed that both Cruz and Gilbane/Cruz had

offered to sign CBAs for the Gilbane/Cruz project, but that the Union refused to allow them to sign until Cruz first signed an all-encompassing agreement, Cruz argues that it was Cruz alone who had the power to resolve the dispute, and thus, the Union's primary dispute was with Cruz, not the joint venture.

■ The test to determine whether corporate divisions are the same person under the Act is whether there is actual or active common control sufficient to denote an appreciable integration of operations and management policies. *AFTRA, Washington–Baltimore Local*, 185 NLRB 593 (1970), *enforced*, 462 F.2d 887, 892 (D.C. Cir.1972). Two commonly owned or affiliated enterprises are not necessarily separate "persons" within the meaning of § 8(b)(4)(B). *Los Angeles Newspaper Guild*, 185 NLRB 303 (1970), *enforced*, 443 F.2d 1173 (9th Cir.1971). The district court held that within the scope of their work as joint venturers, Gilbane and Cruz were one. We agree.

The following facts, as found by the district court, indicate that Gilbane and Cruz were the same person. Gilbane was informed by a Union representative that Cruz had to be a signatory on the CBA in order to work on the job. A Gilbane project manager testified that Cruz was well aware that he had to reach some form of agreement with the Union in order to work on the job. Furthermore, a meeting was held between Cruz, Gilbane and the Union, and Cruz testified that the purpose of this meeting was to "try to prevent the picket lines from being put up," against the Gilbane/Cruz joint venture. The August 12th picket signs stated that the joint venture did not have a contract with the Union. Cruz withdrew from the joint venture.[1] On August 15, the Union was informed of the withdrawal and given proof that Gilbane, rather than the joint venture, would do the work. Lastly, the parties stipulated that the two were joint venturers.

■ Gilbane and Cruz became, for all practical purposes, one by way of a joint venture. The Union aimed its conduct toward the Gilbane/Cruz project and the dispute was between the Union and the joint venture. *See Barss v. Tosches*, 785 F.2d 20, 22 (1st Cir.1986); *see also Local 25, A/W Intern. Broth. of Teamsters v. NLRB*, 831 F.2d 1149, 1152 (1st Cir.1987). The fact that the Union pressured Cruz to sign a CBA encompassing all other Cruz construction projects along with a CBA for the Gilbane/Cruz project does not render its conduct secondary. *See Barss v. Tosches*, 785 F.2d 20, 22 (1st Cir.1986). The object of the picketing was to obtain union jurisdiction over the work of the joint venture, and the only way to do that was to pressure the joint venture as a single entity.

■ Congress has stopped considerably short of proscribing peaceful conduct designed to pressure the employer for agreements regulating relations between the employer and his own employees. *National Woodwork Manufacturers*, supra, 386 U.S. at 620. A secondary boycott is unlawful because it injures the business of a person wholly unconcerned with a disagreement between the employer and his employees. *Id.* at 624. Clearly, neither Gilbane nor Cruz were wholly unconcerned or neutral. It follows that the Union did not violate § 8(b)(4)(B) when it picketed the joint venture at the Gilbane/Cruz project. The district court's finding is affirmed.

## C. *The Barkan/Cruz Project*

A representative of Barkan signed an agreement with the Union on December 12, 1983 for the Barkan/Cruz joint venture, but Cruz was not an individual signatory. Thoresen Forms was an independent subcontractor on the Barkan/Cruz project. Forms was to begin work on January 24, 1984. As previously stated, on the 25th, a Union representative visited the construction site and found two union carpenters,

---

**1.** At that time there was a question concerning funding which may also have prompted withdrawal by Cruz.

employees of Forms, working there. He told them that they were not supposed to be working there, and they left. The Forms work was stopped. The Union representative informed a representative of Barkan that the Union would not allow an agreement with the joint venture unless Cruz Construction first signed a separate agreement covering other Cruz work. Furthermore, the Union would not countenance an agreement with a joint venture where one of the venturers was non-union. The Forms work resumed on February 8. This was the day after Cruz withdrew from the Barkan/Cruz project.

■ The district court found, and we agree, that there was a violation of § 8(b)(4)(B) by the Union in that it coerced employees of Thoresen Forms, a neutral third party, not to supply services to the Barkan/Cruz joint venture. It is well settled that a general contractor and an independent subcontractor working on the same construction project are separate persons within the meaning of § 8(b)(4)(B). *See NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); *Building & Construction Trades Council of New Orleans (Markwell & Hartz, Inc.),* 155 NLRB 319, 326 (1965), *enforced,* 387 F.2d 79 (5th Cir.1967). Forms' employees were "induced and encouraged" to refuse to work on the Barkan/Cruz project. Although the Union representative testified that he told Forms' employees that they were not supposed to be working because of a lack of a pre-job conference, the district court found that the lack of a pre-job conference was merely a pretext for the Union's primary objective of withholding carpenters from the site altogether. This finding was not clear error. "It is not necessary that the only object of the [union's] actions be a secondary one; so long as *an* object is to pressure a neutral employer, the violation is complete." *Local 25, A/W Intern. Broth. of Teamsters v. NLRB,* 831 F.2d 1149, 1153 (1st Cir.1987) (emphasis supplied). Carpenters were withheld until Cruz withdrew from the project and the day after the withdrawal, carpenters were referred to Forms. This conduct was clearly secondary activity on the part of the

Union and thus a violation of § 8(b)(4)(B) because its object was proscribed.

### D. *Damages*

■ Section 303 authorizes damages for "whoever shall be injured in his business or property by reason of any violation of" the secondary boycott provisions of the National Labor Relations Act, 29 U.S.C. § 187. With regard to the Barkan/Cruz project, Cruz is entitled to recover actual and compensatory damages which were the direct and proximate result of unlawful secondary activity. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 729–30, 86 S.Ct. 1130, 1140–41, 16 L.Ed.2d 218 (1966); *Teamsters Local 20 v. Morton,* 377 U.S. 252, 261–62, 84 S.Ct. 1253, 1259–60, 12 L.Ed.2d 280 (1964). Cruz need only establish " 'with reasonable probability the existence of some causal connection between the defendant's wrongful act and some loss of anticipated revenue.' " *Mead v. Retail Clerks Int. Ass'n,* 523 F.2d 1371, 1377 (9th Cir. 1975) (citing *E.V. Prentice Machinery Co. v. Associated Plywood Mills Inc.,* 252 F.2d 473, 477 (9th Cir.1958)).

■ The Union argues that Cruz itself was the direct and proximate cause of the dissolution of the joint venture, and the secondary activity with regard to Forms had little if any bearing on the inevitable. It contends that its policy requiring Cruz' signature on a CBA, coupled with Cruz' decision to remain non-union is what resulted in Cruz' withdrawal. These arguments are at best speculative. The district court found, and we agree, that the pressure exerted by the Union on Thoresen Forms was a substantial cause of Cruz' injury in being forced to withdraw from the Barkan/Cruz project. The finding of secondary activity supports a just and reasonable inference that Cruz was damaged by the Union's action. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 266, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). Parties to bear their own costs.

*Affirmed.*