CRANSHAW CONSTRUCTION OF NEW ENGLAND, L.P., Plaintiff,

v.

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRONWORKERS, AFL–CIO, LOCAL NO. 7, Defendants.

GREEN MOUNTAIN STEEL ERECTORS, INC., Alan Ashey and Michael Cayer, Plaintiffs-in-Intervention,

v.

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRONWORKERS, AFL–CIO, LOCAL NO. 7, Jay Hurley a/k/a John Hurley, Business Agent Local No. 7, Defendants.

Civ. A. No. 94–11362 (MEL).

United States District Court, D. Massachusetts.

May 19, 1995.

Carol Chandler, Andrew L. Matz, Stoneman, Chandler & Miller, Boston, MA and Stanley A. Martin, Gadsby & Hannah, Boston, MA, for Cranshaw Const. of New England, L.P. and Cranshaw Construction of New England, Inc., as General Partner of Cranshaw Construction of New England, L.P.

Christopher N. Souris, Feinberg, Charnas & Schwartz, Boston, MA, and Thomas F. Birmingham, Feinberg, Charnas & Birmingham, Boston, MA, for Ironworkers Local 7 and Intern. Ass'n of Bridge, Structural and Ornamental Ironworkers, AFL–CIO, Local No. 7. Consolidated Defendant.

E. Melvin Nash, Boston, MA and Craig F. Anderson, Law Office of E. Melvin Nash, Boston, MA, for Green Mountain Steel Erectors, Inc., Alan Ashey, and Michael Cayer.

LASKER, District Judge.

This case is the aftermath of a week-long protest by members of a local ironworkers' union at a Boston construction site during the summer of 1994. Cranshaw Construction, the project's general contractor, sues for damages and injunctive relief, alleging that union activity during the protest constituted a secondary boycott prohibited by section 8(b)(4) of the National Labor Relations Act. 29 U.S.C.A. § 158(b)(4)(ii)(B); 29 U.S.C. § 187. Cranshaw also presents various state law claims, all of which Local 7 asserts are preempted by federal law.

Green Mountain Steel—the nonunion subcontractor toward whom most of the protestors' activity was directed—and two of its employees join the lawsuit as plaintiffs. Like Cranshaw, Green Mountain sues for damages pursuant to 29 U.S.C. § 187 and state law. The individual plaintiffs, who are employees of Green Mountain, allege that John Hurley, a business agent for Local 7 who is also named as a defendant, spat in their faces during the protest.

The case against Local 7 and Hurley has been tried to the bench. I find the following facts and reach the following conclusions of law.

## FACTS

The Heritage Project at Cleveland Circle, intended to be an assisted-living residence for the elderly, was in the early stages of construction during the summer of 1994. Cranshaw was the project's general contractor. Among its responsibilities were the hiring and oversight of subcontractors. Cranshaw subcontracted with Bennington Ironworks, a Vermont corporation, to perform the necessary steel work. Bennington, in turn, subcontracted the work to Green Mountain.

The Heritage construction site was surrounded by a chain-link fence. Two gates, one for nonunion employees and one for union workers, were designated Gate A and Gate B, respectively. The nonunion gate, Gate A, was also the main gate to the site—it was used by Cranshaw as well as Green Mountain and other subcontractors. Inside the fence, about 30 feet from the main gate ("the gate"), a Cranshaw trailer was outfitted as an office. John Moriarty, Cranshaw's project superintendent, worked in this office every day, overseeing the work of Green Mountain and the other subcontractors. Green Mountain began its work on the Heritage project on June 20, 1994. At that time, other aspects of construction were also in progress, including excavation, cement work, and carpentry.

John Hurley is a business agent for Local 7 of the International Association of Bridge, Structural and Ornamental Ironworkers. He was elected to this position by Local 7 members shortly before the events culminating in this action.

No Local 7 members were hired to perform steel work at the Heritage project. Hurley visited the site, however, several times. Hurley's first visit took place on April 12, 1994, when he spoke with Moriarty at the Cranshaw trailer. Hurley's next visit to the site was on June 24, 1994, when he was accompanied by a Local 7 member known as "Punchy." Hurley asked John Moriarty, the project superintendent, for papers proving that all of the workers hired to do steel work were paid the "prevailing rate," as required by Massachusetts law for construction funded by the Massachusetts Housing Finance Authority (MHFA). Moriarty referred Hurley to Roger Bouchard, president of Green Mountain, who was on-site that day. Bouchard refused to provide Hurley with the papers he wanted, and the two men became involved in a heated discussion about Green Mountain steelworkers' pay and the fact that Green Mountain's employees were not residents of Massachusetts (Hurley, apparently, was under the mistaken impression that all construction funded by the MHFA had to be performed by Massachusetts residents). Hurley then left Cranshaw's trailer, saying that he would "be back, with others." Hurley's next appearance at the site five days later coincided with the beginning of a week-long protest by Local 7 union members.

*June 29—July 5, 1994*

When Moriarty arrived at the site on June 29, 1994, Hurley and three other Local 7 members were outside the gate. Moriarty opened the gate and went to his trailer. By 6:30 that morning, Moriarty testified, 30 union members blocked the gate. Others entered the gate and climbed up into the boom of Green Mountain's crane. Moriarty called the Boston Police, who advised that an attempt to forcibly remove the men from the crane might be dangerous. The police asked Hurley to tell the men to come down. Hurley at least went through the motions of making such a request, but, whatever the reason, no one complied at the time. At one point on June 29, Moriarty counted 27 men on the crane. A videotape made on this day by a WBZ–TV staff member and exhibited at trial shows the men on the boom of the crane. Cranshaw Ex. 4. Questioned by a reporter, Hurley explains, on the videotape, that the men are protesting the hiring of non-Boston residents at the Boston construction project. The occupation of the crane brought steel work on the building to a complete halt. Ten policemen were hired by Cranshaw to stay on the site overnight.

On the following day, Thursday, June 30, 1994, Moriarty arrived at the site at 5:30 a.m. to find five men, including Hurley, outside the gate, and six others occupying the crane. By 5:45, 57 men were outside the gate. At 6:35, Moriarty testified, Green Mountain's

crane operator was prevented from entering the site by a large group of men which included Hurley; later, a layout engineer was deterred by the protest, and left without attempting to enter the job site.

On Friday, July 1, Moriarty arrived at his trailer at 5:50 a.m. No union members were on the site or outside of it. By 6:05, however, a large group of union members, including Hurley, blocked the gate. Moriarty testified that a carpenter on the job asked for permission to leave the site, which he granted. Later, a truck from Union Concrete, another subcontractor, was blocked from entering the site.

Still on July 1, three Green Mountain employees—Alan Ashey, Michael Cayer and Bouchard, the former two of whom are plaintiffs—attempted to enter the site in a company truck. A videotape made by Moriarty and exhibited at trial filmed the incident from the Cranshaw trailer. Cranshaw Ex. 3. The tape shows a crowd of people, including Hurley, surrounding the stopped Green Mountain truck. Hurley is seen walking from one side of the truck to the other. While the truck was stopped at the gate, one union member crawled underneath the truck and remained there for some time, immobilizing it.

Ashey, Cayer, Bouchard, and Moriarty testified that during the time the truck was stopped at the gate, Hurley spat through the open driver's-side window at Ashey, who was driving, and then, a minute later, through the passenger window at Cayer. Hurley denies that he spat at either man. It is not possible to determine from the videotape alone precisely what happened. However, I fully credit the trial testimony of Ashey and Cayer, and conclude that, although it may have been impulsive and unpremeditated action on the part of Hurley, which he now regrets, he did in fact spit at Ashey and Cayer while they were sitting in the truck.

Eventually, the union member underneath the truck reemerged and was arrested, and the truck backed up and drove away. Moriarty testified that after the truck drove off, Hurley yelled to him, "if this happens again, this place will look like a war zone." Hurley denied making this comment or any like it.

Cranshaw hired a security company to patrol the construction site during the three-day July 4th weekend that began the following morning. No activity was reported on the site July 2, 3 or 4.

On Tuesday, July 5, union members, including Hurley, were back at the job site. Twenty-four members of Local 7 were outside the gate at 6:00 a.m. Later that day, however, the protestors dispersed. They never returned.

After the protestors left, Green Mountain employees discovered that its crane had been damaged during the protest. Steel erection, however, recommenced within a few days. Required repairs to the crane included, among other things, new tires, new glass, and fluid changes. Damage to the chain-link fence surrounding the site also occurred during the period of the protest.

Fearing further action, Cranshaw continued to employ private security guards at night for some time after the protest ended. However, no further incidents occurred.

## CONCLUSIONS OF LAW

I. The Section 303 Claim

*A. Secondary Boycott*

Prohibiting what is known as a "secondary boycott", § 8(b) of the National Labor Relations Act provides:

> It shall be an unfair labor practice for a labor organization or its agents ... (4)(ii) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is ... (B) forcing or requiring any person to cease doing business with any other person ... *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

29 U.S.C. § 158(b)(4)(ii)(B). Section 303 of the Labor Management Relations Act permits persons injured by such an unfair labor practice to recover damages in federal or state court. 29 U.S.C. § 187.

The distinction between primary and secondary activity depends upon "the object of the union's picketing". *John B. Cruz Constr. Co. v. United Brotherhood of Carpenters & Joiners, Local 33*, 907 F.2d 1228 (1st Cir.1990); *Abreen Corp. v. Laborers' International Union*, 709 F.2d 748, 754 (1st Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 702, 79 L.Ed.2d 167 (1984) (citations omitted). The *Abreen* Court explained:

"If the object of the union's conduct is to put direct pressure on the employer with whom the union has a dispute, the conduct is primary and lawful. If, on the other hand, the object of the union's conduct, taken as a whole, is to bring indirect pressure on the primary employer by involving neutral or secondary employers in the dispute, the conduct is secondary and prohibited. Often, of course, the union will have more than one goal, but so long as an object of the conduct is secondary, the conduct is unlawful."

*Id.* at 754–55 (citations omitted). The line between primary and secondary conduct blurs where the primary employer (Green Mountain) and the secondary employer (Cranshaw) are engaged in work at the same site. *Abreen*, 709 F.2d at 755. In *Sailor's Union of the Pacific*, 92 N.L.R.B. 547 (1950), the National Labor Relations Board established an "evidentiary tool" to determine whether a union's conduct at a common work site is purely primary. Under the test, known as the Moore Dry Dock test, union activity is presumed primary if (1) picketing is strictly limited to times when the primary employer is at the site; (2) picketing is limited to times when the primary employer is engaged in work at the site; (3) picketing is limited to places reasonably close to the location of the primary employer; and (4) picketing clearly identifies that the dispute is with the primary employer. *See Abreen*, 709 F.2d at 754. The *Abreen* Court, upholding the district court's finding of union liability, found that, under the Moore Dry Dock test, § 8(b)(4) had been "clearly violated" when a union conducted its protest at a "neutral" gate—that is, a gate established exclusively for subcontractors other than the primary employer—and its picketing signs failed to identify the object of its protest. *Id.* The

Court noted that, even where the four elements of the Moore test were present, a union's activity would nevertheless be unlawful if "in the totality of the circumstances the union's actions put impermissible direct pressure upon a secondary employer." *Id.*

Cranshaw and Green Mountain assert that, in the case at hand, the protestors' behavior clearly demonstrated that they unlawfully intended to prevent Cranshaw from dealing with Green Mountain. The Union, pointing to the fact that Cranshaw employees were not prevented from entering the site, contends that its members were on the site solely to protest Green Mountain's employment of non-Boston residents and to ensure that Green Mountain employees were paid the prevailing wage, and that their conduct was therefore exclusively "primary" and legal.

No picket signs identifying the object of the protest were carried by the Local 7 members at the Heritage site. The protestors' activity, however, was such as to make it clear that they were trying to influence both Green Mountain and Cranshaw: Local 7 members were on the site from the time Cranshaw's superintendent arrived in the early mornings and remained through whole days, and some nights, regardless of whether Green Mountain employees were on the site. The gate at which they conducted their protest was the site's main gate, used by Cranshaw as well as all nonunion subcontractors. During their protest, the men prevented a concrete truck and a layout engineer from entering the gate despite the fact that neither was affiliated with Green Mountain. Furthermore, Hurley warned Moriarty, Cranshaw's superintendent, not to attempt to bring Green Mountain employees onto the site.

From these facts, I find that the Local 7 protestors intended to interfere with Cranshaw's doing business with Green Mountain, whether or not they also intended to pressure Green Mountain to hire Boston residents and pay prevailing wages. In *Abreen*, the First Circuit held that where one union agent told a contractor that his job "would never finish nonunion," the district

court could conclude that the union unlawfully attempted to pressure the contractor not to deal with nonunion subcontractors. 709 F.2d at 756. I draw such a conclusion from the facts of the case at hand.

Accordingly, under either the Moore Dry Dock test or the totality of the circumstances standard, the protestors' activity constituted an unfair labor practice for which § 303 of the National Labor Relations Act provides a remedy.

## B. Liability of the Union

 Local 7 contends that it cannot be held liable for the actions of its members who participated in the protest. It is true that a union is not generally liable for the unauthorized acts of its members. *American Bridge Div., U.S. Steel Corp. v. International Union of Operating Engineers, Local 487,* 772 F.2d 1547 (11th Cir.1985). To be liable under § 303, a union must have instigated, supported, ratified, or encouraged the complained-of activity—in other words, its members must have been acting as agents of the union. *See Abreen,* 709 F.2d at 757; *Feather v. United Mine Workers,* 903 F.2d 961, 970 (3rd Cir.1990). It is equally true, however, that express authorization or ratification by a union is not a prerequisite of union liability for damages resulting from a secondary boycott by its members. *Lane Crane Service, Inc. v. International Brotherhood of Electrical Workers,* 704 F.2d 550 (11th Cir.1983). For example, in *Abreen,* the First Circuit held that where a union agent appeared at a construction site on numerous occasions, participated in secondary picketing, threatened to shoot the head off of a trucker, helped to turn away a neutral subcontractor from the site, and told an official of the plaintiff corporation that the "job would never finish nonunion," the district court appropriately found that the union had participated in the unlawful activity through the acts of its agent. *Abreen,* 709 F.2d at 757.

 Local 7 denies that it in any way authorized or encouraged its members' protest at the Heritage site. Hurley, a business agent for Local 7, admits that he acted as a Local 7 agent at all times relevant to this litigation, but contends that he did not approve of or participate in the illegal acts of the union members.

At trial, Hurley testified that he cooperated with the Boston Police in their efforts to persuade the protestors to come down from Green Mountain's crane and to keep the protestors orderly. But Hurley's role was not merely that of a negotiator. Hurley was one of the first men at the Heritage site on every day of the protest, including the first day, June 29, when Moriarty arrived at 6:00 a.m. to find Hurley and three Local 7 members outside the gate. The two videotapes admitted into evidence demonstrate that he, along with other men, blocked the entrance of the Green Mountain truck to the construction site on July 1. During this encounter, Hurley spat at two Green Mountain employees. He threatened Moriarty that the Heritage site would look like a war zone if there was another attempt by Green Mountain to enter the gate. In sum, Hurley participated in the protest to an extent that rendered Local 7—on whose behalf he concedes he acted—liable.

I have no doubt of the correctness of this conclusion, but nonetheless add that Hurley was clearly in a difficult position—between a rock and a hard place. He was clearly torn, as anyone in his position would have been, between his loyalty and obligation to the union members and his public obligation to avert violence.

## C. Hurley's Liability

 Hurley is correct in his assertion, however, that he may not be held individually liable for the Union's violation of § 303 of the Labor Management Relations Act. Section 303 permits only the recovery of damages from a labor organization, and specifies that its provisions are subject to 29 U.S.C. § 185, which provides that, "[a]ny money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets."

## D. Conclusion

Local 7, through Hurley, engaged in secondary activity prohibited by § 8 of the Na-

tional Labor Relations Act. Pursuant to § 303 of the Labor Management Relations Act, therefore, the union is liable to Cranshaw and Green Mountain for the damages they sustained as a result of the illegal activity.

## II. The State Law Claims

### A. Preemption

■ In *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Supreme Court held that the National Labor Relations Act precludes state courts from awarding damages under state law for acts arguably constituting an unfair labor practice under § 8 of the Act:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield.

359 U.S. at 244, 79 S.Ct. at 779. The Garmon rule remains the standard for determining whether federal labor law preempts state laws which are potentially applicable to various labor disputes. *See Farmer v. United Brotherhood of Carpenters & Joiners,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977); *R.M. Perlman,* 789 F.Supp. 127; *Billy Jack for Her, Inc. v. New York Coat, Suit, Dress, Rainwear & Allied Workers' Union,* 511 F.Supp. 1180 (S.D.N.Y.1981). Accordingly, state claims arising from activity that is arguably regulated by § 7 or § 8 of the N.L.R.A. are presumed preempted under *Garmon* and its progeny. *See R.M. Perlman,* 789 F.Supp. at 129.

The *Garmon* Court recognized, however, that preemption of state law claims may be inappropriate where the conduct at issue is "a merely peripheral concern" of federal labor law, or "touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." 359 U.S. at 243–44, 79 S.Ct. at 779. In other decisions, the Supreme Court refused to preempt claims arising out of malicious libel, *Linn v. United Plant Guard Workers,* 383

U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); intentional infliction of emotional distress, *Farmer,* 430 U.S. 290, 97 S.Ct. 1056; and violent picketing, *Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958). One court has called violent picketing "[t]he paradigmatic example of a case wherein the challenged conduct touches concerns deeply rooted in local feeling and responsibility." *Palm Beach Co. v. Journeymen's & Production Allied Services,* 519 F.Supp. 705, 713 (S.D.N.Y.1981); *See also, Billy Jack,* 511 F.Supp. 1180. The *Billy Jack* Court, holding that a state law claim alleging tortious interference with contractual relations was preempted under *Garmon,* noted that its holding would "be different were Billy Jack's request for relief based on the violence that allegedly attended the union's picketing;" because the state law claim did not rely upon the violence alleged, however, it was preempted. *Id.* at 1182.

■ Cranshaw contends that Local 7's activity during late June and early July, 1994, constituted nuisance, trespass, and intentional interference with contract under Massachusetts law. It is beyond question that Local 7's activity is arguably prohibited by § 8 of the National Labor Relations Act, which forbids secondary boycott activity. 29 U.S.C. § 158(b)(4)(B). *Garmon*'s presumption of preemption therefore applies. It is also true that Cranshaw contends (1) that Hurley made at least one threat of violence during the protest, and (2) that damage was done to its fence during the protest. As Cranshaw characterizes its state law claims, however, they are unrelated to these events. Cranshaw's Pre–Trial Memorandum at 7–9. Rather, like the state claim presented in *Billy Jack,* they address nonviolent interference with Cranshaw's operations. Moreover, the challenged activity is not a "merely peripheral" concern of federal labor laws, but falls within the core of regulated behavior. Accordingly, Cranshaw's state law claims are preempted.

Like Cranshaw, Green Mountain has alleged trespass and intentional interference with contract under Massachusetts law. For the reasons described above, Green Mountain's interference with contract claim, indis-

tinguishable from Cranshaw's, is preempted by federal labor law.

■ The trespass claim presented by Green Mountain, however, poses a more difficult question: Unlike Cranshaw's trespass claim, which challenges the physical placement of the protestors, Green Mountain seeks a remedy for vandalism that destroyed its property. As indicated above, in *Farmer* the Supreme Court held that the National Labor Relations Act did not preempt a state law claim, arising out of a labor dispute, for the intentional infliction of emotional distress. 430 U.S. 290. There, the Court discussed three factors which, taken together, justify a departure from the *Garmon* preemption rule: (1) the underlying conduct is not protected under the Act; (2) there is an overriding state interest in protecting residents from the underlying conduct, and this state interest is "deeply rooted in local feeling and responsibility"; and (3) there is "little risk that the state cause of action would interfere with the effective administration of national labor policy." 430 U.S. at 298, 97 S.Ct. at 1062 (citing *Linn v. United Plant Guard Workers* (holding a state law libel claim unpreempted by the N.L.R.A.)).

I conclude that the application of state law to remedy the damage to Green Mountain's crane is not preempted: As in *Linn* and *Farmer*, the conduct at issue—vandalism—is not protected by the N.L.R.A., the state has a strong interest in protecting its residents from such behavior, and there is little risk of interference with the goals of the federal labor laws. The acts for which Green Mountain seeks redress are a "merely peripheral" concern of the Labor Management Relations Act within the meaning of *Garmon*.

The individual plaintiffs, Ashey and Cayer, contend that Hurley committed assault and battery under Massachusetts law when he spit at each of them in separate incidents. Hurley does not contend that these claims are preempted by federal law.

In sum, Green Mountain's trespass claim and the assault and battery claims of Ashey and Cayer are not preempted by federal labor law. The remaining state law claims are dismissed.

### B. Trespass & Vandalism

Green Mountain contends that Local 7 is liable for the damage to its crane under state law. Local 7 counters that Green Mountain has not established (1) that Local 7 members damaged the crane, or (2) that, even assuming that union members harmed the crane, the union may appropriately be held liable for the damage.

■ It is true that no direct proof exists that union members damaged the crane while they occupied it during the Heritage protest. Two circumstances, however, lead to the conclusion that the vandalism was in fact committed by the Local 7 members on the crane: First, they were there; no one else was seen near the crane during the demonstration. Second, as testified to by Bouchard, who has worked with cranes over a period of years, the type of damage done to the crane suggests that it was the act of steelworkers: (1) there was an ironworker's tool in the crane's oil tank; (2) the ball of the crane was lowered by someone who knew how to use the crane's brake lever, and the line was carefully tied to the lattice of the boom, ensuring the safety of the people who climbed the boom of the crane; (3) the tires, each of which contains 95 to 105 pounds of pressure, were drilled, permitting damage without the dangerous explosion that might have resulted if they had been punctured suddenly; and (4) it appeared that people had crawled through the body of the crane, including the crane's gears, an activity requiring knowledge of crane mechanics.

■ Although I conclude that Local 7 members damaged Green Mountain's crane, federal law dictates that the union cannot be held liable for violations of state law by its members unless actual participation by the union is established. Section 6 of the Norris–LaGuardia Act provides:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authoriza-

tion of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106. In *United Mine Workers v. Gibbs*, the Supreme Court noted that this "clear proof" standard applies to federal court adjudications of state-law claims arising out of labor disputes, whether or not they are associated with claims under § 303 of the Labor Management Relations Act, to which the heightened standard does not apply. 383 U.S. 715, 737, 86 S.Ct. 1130, 1144–45, 16 L.Ed.2d 218 (1965). The clear proof standard requires a plaintiff "to persuade by a substantial margin, to come forward with more than a bare preponderance of the evidence to prevail." *Id.* (citation omitted). The *Gibbs* Court emphasized that no liability may be imposed upon the union unless actual union involvement is demonstrated:

> What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force.

*Id.* In view of the fact that John Hurley was on the site during the occupation of the crane by union members, a strong argument may be made that Local 7, through Hurley, knowingly tolerated the union members' vandalism. However, because the liability of the union for the acts of the protestors has already been established under federal law, the question need not be decided here.

### C. Assault & Battery

■ The individual plaintiffs, Ashey and Cayer, each testified that Hurley spat in their faces during the July 1 confrontation between the occupants of the Green Mountain truck and members of Local 7. Hurley denies the accusation. I conclude that the incidents did occur, and that Hurley is liable under state law.

■ Ashey and Cayer contend that Local 7, as well as Hurley, should be held liable for Hurley's acts. As more fully described above, § 6 of the Norris–LaGuardia Act prevents such liability in the absence of clear proof that the union approved of, participated in, or ratified the batteries by Hurley. 29

U.S.C. § 106; *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1965). No such proof exists here. Accordingly, Ashey and Cayer may look only to Hurley for damages under state law.

### III. Injunctive Relief

Cranshaw seeks an injunction enjoining union members from, among other things, picketing at any Cranshaw construction project with more than a total of five individuals and approaching within six feet of any vehicle attempting to enter or exit any Cranshaw construction site. Local 7 contends that the court does not have authority under § 303 of the Labor Management Relations Act to grant injunctive relief, and that the Norris–LaGuardia Act deprives the Court of jurisdiction to grant such an injunction.

As observed by Judge Skinner in *Suffolk Constr. Co. v. Local 67*, 736 F.Supp. 1179 (D.Mass.1990), private parties may not seek to enjoin secondary boycotts under § 303 of the Labor Management Relations Act. *Id.* at 1180. Judge Skinner, however, found that a federal district court "has general equitable power to enter injunctions in aid of its jurisdiction in § 303 cases, subject to the constraints of the Norris–LaGuardia Act," and that, furthermore, where pendent state claims are presented in a labor case, a federal court may issue an injunction under state law. *Id.* at 1181–82.

■ The Court's authority to enjoin the union is limited, however, by the Norris–LaGuardia Act, regardless of whether the injunction is designed to remedy violations of state or federal law. Section one of that Act provides:

> No court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter.

29 U.S.C. § 101. In *Burlington N.R. Co. v. Brotherhood of Maintenance of Way Employes*, the Supreme Court noted that the Norris–LaGuardia Act "expresses a basic policy against the injunction of activities of

labor unions." 481 U.S. 429, 437, 107 S.Ct. 1841, 1846, 95 L.Ed.2d 381 (1987) (citation omitted). Section 7 of the Act provides that a labor union's activities may not be enjoined unless it is found after a hearing that:

(1) Unlawful acts have been threatened and will be committed unless restrained;

(2) Substantial and irreparable injury to complainant's injury will follow;

(3) As to each item of relief granted, greater injury will be inflicted upon the complainant by the denial of such relief than will be inflicted upon the defendants by the granting of relief;

(4) Complainant has no adequate remedy at law; *and*

(5) The public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

 While Cranshaw is correct that, under some circumstances, the Court has authority to grant injunctive relief in a § 303 case, it has not demonstrated that those circumstances are present in the case at hand: There has been no showing that Local 7 has threatened any unlawful acts in the ten months since the protest at the Heritage site ended, that injury to Cranshaw's property is likely, that the remedy provided by § 303 inadequately compensates Cranshaw for its injuries during the Heritage protest, that the Boston Police Department is unwilling or unable to provide appropriate protection, or that the relief requested will not cause greater harm than it avoids. Accordingly, Cranshaw's request for injunctive relief is denied. *Cf. Suffolk Constr. Co.*, 736 F.Supp. at 1182–83 (issuing an injunction only after a specific finding of each circumstance required by the Norris–LaGuardia Act).

## IV. Damages

### A. *The § 303 Claims by Cranshaw & Green Mountain*

 Section 303 of the Labor Management Relations Act permits the recovery of actual and compensatory damages which are the direct and proximate result of unlawful secondary activity. *Cruz*, 907 F.2d at 1232; 29 U.S.C. § 187. In order to recover, Cranshaw and Green Mountain must demonstrate "with reasonable probability the existence of some causal connection between the defendant's wrongful act and some loss of anticipated revenue." *Cruz*, at 1232 (citing *Mead v. Retail Clerks International Association*, 523 F.2d 1371, 1377 (9th Cir.1975)). However, an unlawful labor practice need not be the only cause of the injury at issue: In *Mead*, the Ninth Circuit held that the offending conduct must have "materially contributed" to the injury, or been a "substantial factor in bringing it about, notwithstanding other factors contributed also." *Mead* at 1376 (citations omitted). With these precepts in mind, each of Cranshaw's and Green Mountain's specific claims is examined below.

### 1. Cranshaw's damages:

#### a. *Police detail*

 Cranshaw hired off-duty police officers to patrol the Heritage site during the protest and over the weekend of July 4th. Robert Lyons, a Cranshaw employee and manager of the Heritage project, testified that 15 officers were hired to patrol the site over the holiday weekend upon the recommendation of an official of the Boston Police Department. The union contends that, in light of the fact that no construction was scheduled to take place over the weekend, this expenditure was unjustified.

As more fully described above, during the three days immediately preceding the holiday weekend—June 29, June 30 and July 1— Local 7 members gathered in large groups outside the site, occupied a crane on the site itself, threatened Cranshaw's job superintendent, and crawled underneath a Green Mountain truck in order to prevent it from entering the site. On Friday, July 1, at least one Local 7 member was arrested at the site. The hiring of a police detail was a reasonable reaction to these events.

An invoice shows that Cranshaw paid $37,483.38 for the presence of off-duty police from June 29 to July 5, 1995. Cranshaw Ex. 10.

### b. Private security

Beginning July 1, 1995, Cranshaw also hired a private security firm to guard the Heritage site. Cranshaw retained the firm for the nearly two months after the end of the Local 7 protest that Green Mountain continued to work on the Heritage project. Local 7 contends that the two month continuance of private security was excessively long. I find, however, that the fact that Green Mountain continued to perform steel work during this period was reason enough to take security precautions. A Cranshaw executive testified that no union representative gave any assurance that the protestors would not return.

Cranshaw has submitted a collection of invoices showing that it paid Northeast Security, a private security firm, $14,228.13 for work performed between July 1, 1995 and August 5, 1995. Cranshaw ex. 9A–9J.

### c. Fence repair

■ Cranshaw officials testified that, after the Local 7 protest, it discovered damage to the fence surrounding the Heritage site. Cranshaw contends that the cost of repairs to the fence, $447.00, should be included in its award for damages. Cranshaw Ex. 8. Local 7 responds, and appropriately so, that Cranshaw failed to establish that the damage to the fence was done by union protestors. Because Cranshaw made no showing that the damage to the fence was a result of illegal activity on the part of Local 7, no award is justified.

### d. Videotape

■ Cranshaw includes in its request for damages the cost of processing the videotape filmed by Moriarty on June 30 and July 1, 1995 (Cranshaw Ex. 3). Cranshaw does not explain, however, how the fee qualifies as an injury for which § 303 provides a remedy.

### e. General conditions

Lastly, Cranshaw contends that it is entitled to "general conditions costs"—including the costs of maintaining the on-site facilities as well as employee salaries and benefits—for the seven-day delay in completion of construction which, according to Cranshaw, would inevitably result from the illegal union activity. Local 7 counters that (1) a seven-day delay was not proven at trial and (2) Cranshaw's carrying costs, such as the salaries of Cranshaw employees, may not be deemed an injury resulting from Local 7's activity in the absence of proof that Cranshaw was delayed in starting a new project. Unless work on another project is waiting in the wings, the union argues, a delay in construction is not a cognizable injury.

■ Cranshaw is certainly entitled to the cost of maintaining the on-site facilities while union activity prevented construction work. Unlike Cranshaw's general overhead expenses, these costs were incurred solely in connection with the Heritage project.

■ Cranshaw claims that it is also entitled to the full daily pay of five Cranshaw employees for the period of the protest. Cranshaw reports that the total pay of its project administrator, project manager, superintendent, accountant, and administrator was $2,088 per day. Cranshaw Ex. 14. While there was some uncertainty resulting from the cross-examination of the witnesses as to the precise method utilized by Cranshaw in specifying the compensation of its managerial staff, I am satisfied that it amounted to approximately the $2,088 figure.

John Onufrak, Cranshaw's president, testified that 90% of the company's resources were concentrated on the Heritage project during the protest, rather than the 25% that would have spent on the project under normal circumstances. However, it is very difficult to estimate from the evidence presented at trial the extent to which the managerial employees were diverted from their assigned occupations. As well as can be determined, I conclude that the defendants' work stoppage reduced the productivity of these employees by 50%.

Finally, I find that a seven-day delay in construction completion was not established. Although the protestors were present at the site for 4 and ½ days, the testimony established that some work by subcontractors other than Green Mountain continued during at least part of this period. Furthermore, while repairs to the crane took a day or so, Cran-

shaw has presented no evidence to show why other construction work could not recommence immediately after the end of the protest. While the delay caused by Local 7 cannot be precisely measured, I find that it amounted to five days.

Since the daily cost of maintaining Cranshaw's temporary facilities was $130.48, Cranshaw is entitled to $652.40. See Cranshaw Exs. 11–14.

As discussed above, the productivity of five Cranshaw managerial employees was reduced by 50% during the protest. Therefore, Cranshaw is entitled to five times 50% of $2,088, or $5,220.

2. Green Mountain's damages:

*a. Damage and repairs to the crane*

 Green Mountain is entitled to the costs of repairing its crane. Invoices detailing the costs of new tires, replacement glass, and fluid changes, among other repairs, total $11,251.52. Green Mountain Exs. 3–6, 10. Nearly $9,000 of this sum was spent on a new set of 13 crane tires. The union objects that the damage to the tires was not severe enough to justify their replacement. Bouchard testified, however, that highway driving on damaged tires can be dangerous—I conclude that it was a risk that Green Mountain was not required to take.

I agree, however, with the union's contention that the worn condition of the tires before the protest justifies a reduction in Green Mountain's award for the brand new set. An independent appraiser recommended to Green Mountain's insurer that, judging from the amount of tread remaining on each tire replaced, a $3,813 "betterment deduction" was appropriate, and this appears to be an appropriate deduction in the circumstances. Green Mountain Ex. 11.

In addition, Green Mountain claims that it is entitled to damages for crane-repair work performed by its own employees. I find that Green Mountain employees spent 45 hours checking and repairing the crane. A third-party appraisal submitted to Green Mountain's insurance company reports that $40 per hour is reasonable compensation for this type of work. Green Mountain Ex. 11.

Accordingly, Green Mountain is entitled to $11,251.52 less $3,813.00, or $7,438.52 for damage to its crane and $1,800 for the 45 hours of repair work performed by Green Mountain employees.

*b. Employee time*

 There is no merit to Green Mountain's claim that it is entitled to damages for the time that its employees were prevented from working on the Heritage Project, whether or not Green Mountain actually paid the employees for the idle time.

However, Green Mountain did pay seven of its employees for 2 hours of "show-up" time on both June 29 and 30, 1995. Because Local 7's unlawful activity completely prevented the men from performing construction work on those days, Green Mountain is entitled to recover the wages actually paid during those days, or $448. See *American Bridge*, 772 F.2d at 1552. The 28 hours of show-up time is awarded at the rate actually paid, or $16 per hour, not at the higher rate proposed by Green Mountain, which includes company overhead and profits.

*c. Crane's "down time"*

 Local 7's occupation of Green Mountain's crane immobilized it for a period of 5 days, including repair time. It may be assumed that the delay required that the crane remain at the site five days longer than originally anticipated. Green Mountain asserts that it is therefore entitled to five times the crane's daily rental rate, or $5,000. Green Mountain has not demonstrated, however, that it intended to—or could have—rented its crane for the five days following the completion of steel work at the Heritage site. In the absence of such a showing, any award is inappropriate.

3. Ashey's & Cayer's damages

 Although state law remedies for acts of violence arising in labor disputes have been sustained against the challenge of preemption by federal labor laws, the scope of such remedies is confined to the direct consequences of such conduct. *United Mine Workers v. Gibbs*, 383 U.S. at 729–31, 86 S.Ct. at 1140–41.

Ashey and Cayer, the battery victims, testified that no physical or serious emotional injury resulted from the assaults against them. I conclude that compensation in the amount of $250.00 to each of them is appropriate to redress the insult which each of them suffered.

4. Prejudgment interest

 Section 303 of the Labor Management Relations Act is silent on the issue of prejudgment interest. The First Circuit has, without comment, affirmed both an award and a denial of prejudgment interest pursuant to § 303. *See Allied International v. International Longshoremen's Association,* 814 F.2d 32, *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 41 (1st Cir.1987); *Cruz Constr.,* 907 F.2d 1228 (1st Cir.1990). Recently, however, the Second Circuit held that the award of prejudgment interest in a § 303 case is within the discretion of the court. *Wickham Contracting Co. v. Local Union No. 3, IBEW,* 955 F.2d 831 (2d Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992). Characterizing the Supreme Court's approach to prejudgment interest as the " 'equitable' and discretionary rule," the *Wickham* Court held that interest may properly be awarded under § 303 "based on the need for full compensation and fairness under the circumstances." *Id.* at 836. The Court noted, however, that prejudgment interest is inappropriate where such an award would overcompensate the plaintiff. *Id.* at 834.

Even assuming that prejudgment interest is properly awarded in some § 303 cases, I find that such an award is inappropriate in the case at hand. This case was promptly tried and decided within one year of the protest; furthermore, the extra expenditures resulting solely from the work delay should not be felt until the final five days of construction, which are yet to come.

V. Conclusion

Cranshaw and Green Mountain have established a violation of § 303 of the Labor Management Relations Act by Local 7 and are entitled to damages as specified above. Ashey and Cayer are each entitled to $250 from Hurley for the July 1, 1994 assaults against them.

Submit Judgment on Notice.